## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

ENZO LIFE SCIENCES, INC., a New York corporation,

Plaintiff,

v.

ADIPOGEN CORPORATION, a California corporation, ADIPOGEN INTERNATIONAL, INC., a Delaware corporation, BIOAXXESS, INC., a Delaware corporation, GEORGES CHAPPUIS, an individual, TAMARA SALES, an individual, SILVIA DETTWILER, an individual, and DOES 1 through 50,

Defendants.

1:11-CV-00088-RGA

MEMORANDUM OPINION

James Tobia, Esq., The Law Offices of James Tobia, Wilmington, DE; Andrew B. Kratenstein, Esq., McDermott Will & Emery LLP, New York, NY; Sandra B. Saunders, Esq., McDermott Will & Emery LLP, New York, NY, attorneys for Plaintiff.

John Leonard Reed, Esq., DLA Piper LLP, Wilmington, DE; Brian A. Biggs, Esq., DLA Piper LLP, Wilmington, DE; Joseph J. Ortego, Esq., Nixon Peabody LLP, New York, NY; Barbara A. Lukeman, Esq., Nixon Peabody LLP, New York, NY, attorneys for Defendants.

March 12, 2015

*Rwhand G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

Enzo Life Sciences, Inc. ("ELS"), a New York corporation, brought this suit against

Adipogen Corp., Adipogen International, Inc., Bioaxxess, Inc., Dr. Georges Chappuis, Ms.

Tamara Sales, Ms. Silvia Dettwiler, and Does 1 through 50.[1] (D.I. 1). ELS is a publicly traded

company that acquired Axxora Life Sciences, Inc., and its five wholly owned subsidiaries,

including Alexis Corporation and Apotech Corporation, pursuant to a stock purchase agreement

("the Stock Purchase Agreement") dated May 29, 2007. ELS alleges that Dr. Chappuis, Ms.

Sales, and Ms. Dettwiler ("the Individual Defendants") breached the Stock Purchase Agreement

and, along with Adipogen and Bioaxxess ("the Corporate Defendants"), committed various

tortious acts. Defendants deny Plaintiff's allegations. There are no counterclaims or cross

claims. The Court held a four-day bench trial on August 11-14, 2014.

The Court finds in favor of Plaintiff as to Count I and for Defendants on all remaining

counts.[2] The Court grants nominal damages in the amount of one dollar against each of Ms.

Sales and Ms. Dettwiler, and ten dollars against Dr. Chappuis, in addition to pre- and post-

judgment interest.

## FINDINGS OF FACT

The Court ordered the parties to propose findings of fact. (Tr. 1334-35). The parties

submitted one hundred fifty-six pages of proposed findings of fact. (D.I. 180, 181, 182). The

Court makes the following findings of fact.

---

[1] At trial, and in the post-trial briefings, no claim was made against Does 1-50. Therefore, the Court finds for Does 1-50 on all counts of the Complaint. (D.I. 1).

[2] At the Court's request, the parties submitted letters regarding whether ELS has standing to assert Counts VI through XII. (D.I. 199, 201). The standing issue does not implicate the Court's jurisdiction and generally overlaps with Plaintiff's proof of injury, and it is therefore not separately addressed.

1

# I. ELS'S PURCHASE OF AXXORA

For over thirty years, Plaintiff ELS has been in the business of developing, producing, marketing, acquiring, sourcing, and selling life science research materials to scientific researchers in academia, clinical research, and drug discovery. (Tr. 57:1-2, 59:11-60:12). Between 2007 and 2009, ELS acquired four companies and their subsidiaries, at a total cost of over $40 million. (Tr. 60:24-61:12). One of the companies ELS acquired was Axxora Life Sciences, Inc. ("Axxora"), a global manufacturer and marketer of life sciences research products. (*Id.*; Stip. Facts ¶¶ 27-30;[3] PX5). Axxora was a Delaware corporation. (PX5 at ADIPOGEN-0005283). Axxora had a number of subsidiaries, including two that are relevant to this lawsuit, the Swiss companies Alexis Corporation ("Alexis") and Apotech Corporation ("Apotech"). (Tr. 63:16-22).

In May 2007, ELS paid approximately $16.3 million to acquire Axxora and its five wholly owned subsidiaries, as set forth in the Stock Purchase Agreement. (Tr. 66:1-24; PX5; Stip. Facts ¶¶ 27-28). Under the terms of the Stock Purchase Agreement, ELS acquired all of the issued and outstanding capital stock of Axxora. (Tr. 61:1-13; PX5; Stip. Facts ¶ 28). Axxora became a wholly owned subsidiary of ELS. (Tr. 66:20-24; PX5). Thus, Axxora and its subsidiaries brought substantial assets to the ELS family, including the various agreements related to the distribution, supply, consignment, and licensing of unique products as set forth in Schedule 3.4(c) of the Stock Purchase Agreement and the license/royalty agreements set forth in Schedule 3.10(e) of the Stock Purchase Agreement. (PX5 at ADIPOGEN-0005404-5406, ADIPOGEN-0005426-5437). Dr. Elazar Rabbani, CEO of ELS, approved the Stock Purchase Agreement before it was signed. (Tr. 68:9-19). Dr. Rabbani testified that he "did not read [the

---

[3] "Stip. Facts" refers to the "Admitted Facts Requiring No Proof," attached as Exhibit A to the Proposed Joint Pretrial Order. (D.I. 155).

Stock Purchase Agreement] line by line" but was briefed on the principal provisions of the agreement. (Tr. 159:3-20). Dr. Carl Balezentis, President of ELS, negotiated the terms of the Stock Purchase Agreement on behalf of ELS. (Tr. 156:13-16, 156:23-157:4, 159:6-13, 159:19, 159:24-160:1, 160:14-18; PX5 ¶ 10.3).

One factor that ELS considered when it purchased Axxora was the experience of Dr. Chappuis, Axxora's President and Chief Executive Officer, and that of his management team. Dr. Chappuis presented himself to ELS as a knowledgeable, experienced, committed, and capable executive in the life sciences field with numerous industry contacts. (Tr. 65:10-18). Dr. Chappuis further represented that the Axxora management team, including Tamara Sales and Silvia Dettwiler, would be an integral part of his management contribution. (Tr. 65:19-24). Dr. Chappuis and Ms. Dettwiler had worked together for thirty-five years. (Tr. 983:3-984:5, 1289:7-9). Dr. Chappuis and Ms. Sales had worked together for over seventeen years. (Tr. 1139:20-1140:7, 1162:19-22).

Dr. Chappuis and Elliot Feuerstein were designated as the "Securityholders' Representatives" in the Stock Purchase Agreement, and, as such, were authorized to act on behalf of Axxora's investors to consummate the transaction. (PX5 ¶ 1.8(a)). The signatories to the Stock Purchase Agreement included Dr. Chappuis, as President and CEO of Axxora, as well as all of the individual investors in Axxora, including Ms. Dettwiler, Ms. Sales, Craig Andrews (a lawyer at DLA Piper LLP who also served as Axxora's and Dr. Chappuis's counsel), and the Elliot Feuerstein Trust. (Tr. 70:8-72:12, 419:12-15; PX5 at ADIPOGEN-0005355-79). Dr. Chappuis executed the Stock Purchase Agreement in both his corporate and individual capacities, while Ms. Dettwiler and Ms. Sales signed only in their individual capacities. (Tr. 70:8-72:12; PX5 at ADIPOGEN-0005355-57, ADIPOGEN-0005372).

3

The Individual Defendants each owned equity interests in Axxora. (Tr. 70:8-72:12, 419:12-15; PX5 at ADIPOGEN-0005355-79). In connection with the acquisition, Dr. Chappuis received $1,374,945 for his Axxora equity interest. (Tr. 73:10-17; PX5 Schedule II). Ms. Dettwiler received $706,997 for her Axxora equity interest. (PX5 at ADIPOGEN-0005384). Ms. Sales received $227,448 for her Axxora equity interest. (PX5 at ADIPOGEN-0005387).

After ELS acquired Axxora, ELS acquired BVBA, a life sciences products distribution company. (Tr. 979:17-24). In May 2008, ELS acquired BIOMOL International ("Biomol") of Plymouth Meeting, Pennsylvania, which manufactures life sciences products. (Stip. Facts ¶ 48; D.I. 71-5 ¶ 11; Tr. 1009:23-1010:20). In March 2009, ELS acquired Assay Designs, Inc. ("Assay Designs") of Ann Arbor, Michigan, which manufactures life science products. (Tr. 275:18, 276:4, 1009:23-1010:20; Stip. Facts ¶¶ 46-48; D.I. 71-5 ¶ 11).

## II.    THE STOCK PURCHASE AGREEMENT

Pursuant to Paragraph 5.17(a) of the Stock Purchase Agreement, entitled "Non-Competition," Dr. Chappuis, Ms. Dettwiler, Ms. Sales, and others agreed, for a period of two years from the execution of the Stock Purchase Agreement (that is, from May 31, 2007 through May 31, 2009), not to participate in any way in a business that directly or indirectly competes with any "Acquired Company," defined in the Stock Purchase Agreement as Axxora and its subsidiaries. (Tr. 75:3-78:2; PX5 ¶ 5.17(a), Art. IX). As provided by Schedule 2.1(d) and Schedule 3.4(a), "[t]he non-competition provisions of the Purchase Agreement and employment agreements may only be enforced to the extent they comply with applicable California law." (PX5 at ADIPOGEN-0005395, ADIPOGEN-0005403). Specifically, that paragraph provided:

> During a period of two years from the Closing Date, each of Georges Chappuis, Ph.D., Silvia Dettwiler, Tamara Sales . . . for himself, herself or itself or on behalf of or in conjunction with any other Person, will not, directly or indirectly, compete, own, operate, control, or participate or engage in the ownership, management, operation or control of, or be connected with as an officer, employee, partner,

4

director, shareholder, representative, consultant, independent contractor, guarantor, advisor or in any other manner or otherwise have a financial interest in, any other Person that is engaged in a business that directly competes with any business of any Acquired Company, including the development, production, manufacturing, in-licensing, commercialization and worldwide marketing and sales of life sciences research reagents and the development, operation and worldwide marketing of online purchasing marketplaces for research reagents and businesses ancillary thereto (the "Business") . . . .

(PX5 ¶ 5.17(a) (emphasis omitted)). The paragraph continued:

[P]rovided, however, that nothing contained in this Section 5.17(a) shall be deemed to prevent such Party from (i) beneficially owning, directly or indirectly, 5% or less of any class of securities of an entity that has a class of securities registered under Section 12 of the Exchange Act or (ii) directly or indirectly (as a principal or agent or otherwise and alone or in association with any other Person) carrying on, engaging or taking part in, rendering service to or owning, sharing in the earnings or investing in the stocks, bonds or other securities of any Person 10% or less of whose gross revenues for the preceding calendar year were not, and for the calendar year in question are not reasonably expected to be, derived from being engaged in the Business; provided, further, that such relationships do not constitute bad faith efforts to circumvent the covenant set forth in this Section 5.17(a).

(PX5 ¶ 5.17(a) (emphasis omitted)).

Similarly, Paragraph 5.17(b) of the Stock Purchase Agreement, entitled "Non-

Solicitation," prohibited Dr. Chappuis, Ms. Dettwiler, Ms. Sales, and others from soliciting,

interfering with, or disrupting the relationship between any Acquired Company and any of its

employees, customers, suppliers, or business partners for a period of two years from the

execution of the Stock Purchase Agreement (that is, from May 31, 2007 through May 31, 2009).

(PX5 ¶ 5.17(b); Tr. 79:10-19).

Specifically, that paragraph provided:

During a period of two years from the [May 31, 2007] Closing Date, each of [Dr. Chappuis], [Ms. Dettwiler], [and Ms. Sales] ... and their respective Affiliates, for himself, herself or itself or on behalf of or in conjunction with any other Person, will not, directly or indirectly: (i) solicit, endeavor to entice away from any Acquired Company, or otherwise interfere with or disrupt, or attempt to interfere with or disrupt, the relationship, contractual or otherwise, between any Acquired Company, on the one hand, and any Person who is employed by or otherwise

5

engaged to perform services for any Acquired Company, on the other hand, or (ii) solicit, endeavor to entice away from any Acquired Company, or otherwise interfere with or disrupt, or attempt to interfere with or disrupt, the relationship, contractual or otherwise, between any Acquired Company, on the one hand, and any Person who is or was within the then most recent two year period, a client, customer, supplier, manufacturer, distributor, consultant, licensor, licensee, or other Person.

(PX5 ¶ 5.17(b)). Paragraph 5.17(c) of the Stock Purchase Agreement, entitled "Confidentiality,"

prohibited Dr. Chappuis, Ms. Dettwiler, Ms. Sales, and others from disclosing any confidential

information of any Acquired Company. (PX5 ¶ 5.17(c); Tr. 79:20-23). That paragraph also

required (without regard to any time period) that all confidential business information was to

remain the property of the Acquired Companies and be returned upon departure from the

company. (PX5 ¶ 5.17(c)). Specifically, Paragraph 5.17(c) stated:

> From and after the Closing Date, each of [Dr. Chappuis], [Ms. Dettwiler], [and Ms. Sales] ... and their respective Affiliates, for himself, herself or itself or on behalf of or in conjunction with any other Person, will not, directly or indirectly, print, publish, divulge or communicate to any Person or use for his, her or its own account any trade or business secret, process, method or means, or any other Confidential Information concerning any Acquired Company. Such Party further agrees and acknowledges that all of such Confidential Information, in any form, and copies and extracts thereof, are and shall remain the sole and exclusive property of the Acquired Companies . . . .

*Id.*

These covenants were essential to ELS's decision to proceed with the acquisition of

Axxora and the execution of the Stock Purchase Agreement. (Tr. 80:23-81:8; PX5 ¶5.17(d)). As

memorialized in Paragraph 5.17(d) of the Stock Purchase Agreement:

> Each of [Dr. Chappuis], [Ms. Dettwiler], [and Ms. Sales] . . . and their respective Affiliates, further acknowledge and agree that: (i) the covenants contained in this Section 5.17 are essential elements of this Agreement and that but for the agreements of such Party to comply with such covenants, the Buyer would not have entered into this Agreement . . . .

*Id.*

6

These restrictive covenants could only be amended or waived in writing. (Tr. 81:9-82:11; PX5 ¶ 10.9). Specifically, Paragraph 10.9 of the Stock Purchase Agreement provided:

> The Parties may mutually amend any provision of this Agreement at any time prior to the Closing. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer, the Company and the Shareholders' Representatives. No waiver of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the Party giving such waiver. No waiver by any Party with respect to any default, misrepresentation or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(PX5 ¶ 10.9). No written amendments to the Stock Purchase Agreement were made, nor was any written waiver granted. (Tr. 998:21-24).

Immediately after the acquisition of Axxora on June 1, 2007, the Individual Defendants were placed in high-level positions at Axxora and/or Alexis, an Axxora subsidiary, which was later renamed Enzo Life Sciences AG ("ELS AG").[4] (Tr. 66:14-19, 106:17-107:5; PX9). Dr. Chappuis was named President of Alexis. (PX6 ¶ 1(a)). The employment contract acknowledged that Dr. Chappuis "is and will continue to be non-compensated consultant with AdipoGen, Inc. (Seoul, Korea), BioViotica GmbH (Göttingen, Germany), CovalAb (Lyon, France) and Chimerigen, Inc. (Boston, USA)." (PX6 ¶ 1(d)).

Ms. Dettwiler was named Vice President Operations Europe of Alexis Corporation and deputy of Georges Chappuis. (PX7 ¶ 1(a); Stip. Facts ¶ 24). Ms. Dettwiler also had responsibility for purchasing, inventory control, systems support, customer and technical service, and had approximately eighteen employees reporting to her. (Tr. 284:9-21, 1306:3-22).

---

[4] The existence of similarly-named entities (*i.e.*, ELS and ELS AG) resulted in a trial transcript that is often unclear as to which entity a witness was testifying about. The Court has used its judgment to clarify the testimony based on the record as a whole.

7

Ms. Sales signed a substantially similar Employment Agreement with Axxora, LLC, dated June 1, 2007, naming her Vice President of Finance and Administration of the life sciences business. (Tr. 91:4-93:11; PX8 ¶¶ 1(a), 5-8). The employment agreement was exclusively governed by New York law and contained an arbitration clause. (PX8 ¶ 13(d)). Ms. Sales also had responsibility for the ELS division financial reporting to ELS's parent company, Enzo Biochem, Inc. (Tr. 286:12-18).

In 2008, ELS named Dr. Chappuis Global Head of Marketing for all of ELS's operations. (Tr. 108:13-109:5, 280:18-24). Dr. Chappuis was in charge of global marketing, business development, and mergers and acquisitions. (Tr. 981:6-16; Stip. Facts ¶ 16). Dr. Chappuis introduced Jürgen Graner, of the consulting firm Globalator, to Dr. Balezentis. (Tr. 984:17-21). Upon Dr. Chappuis's urging, ELS retained Mr. Graner as a consultant to ELS. (Tr. 772:22-773:20).

## III.   THE EXCLUSIVE SALES AND MARKETING AGREEMENT WITH ADIPOGEN

### A.    The Original 2005 Exclusive Sales and Marketing Agreement with Adipogen

The Alexis–Adipogen relationship was based on an "Exclusive Sales and Marketing Agreement" dated November 2, 2005, by which Alexis was granted the exclusive right to import, market, distribute, use, and sell Adipogen's products in all global markets except Asia, and the non-exclusive right to use the name "AdipoGen" in marketing, distributing, and selling Adipogen products. (Tr. 110:3-115:1; PX1 ¶ 2). Dr. Chappuis signed the Exclusive Sales and Marketing Agreement on behalf of Alexis and Dr. Byung Soo-Youn signed it on behalf of Adipogen. (Tr. 110:3-24; PX1; Stip. Facts ¶ 36).

The text of the Exclusive Sales and Marketing Agreement contained a one-way exclusivity provision, which meant that the agreement imposed no restrictions on when, where,

8

or to whom Alexis could sell its products. (Tr. 113:23-115:1, 146:24-148:8, 1014:5-1017:12; PX1 ¶ 2(a)). As Dr. Chappuis testified, the "legal text" of the Exclusive Sales and Marketing Agreement did not state that the exclusivity ran both ways. Rather, he believed that Alexis had an "ethical obligation" not to sell products that competed with Adipogen. Dr. Chappuis further testified that he did not explain his understanding of the ethical implications of the agreement to ELS during the negotiations between Axxora and ELS over the Stock Purchase Agreement. (Tr. 1014:5-1018:10).

The Exclusive Sales and Marketing Agreement also allowed Alexis to obtain Adipogen products at a 60% discount rate off of its U.S. list price. (Tr. 112:13-113:17; PX1 ¶ 1(b)). In exchange, Alexis was obligated to place a minimum amount of monthly orders with Adipogen and to "undertake a reasonable effort to market" Adipogen products. (PX1 ¶ 7). The initial term of the Exclusive Sales and Marketing Agreement was for two years, with automatic renewals thereafter for periods of one year each. (Tr. 115:5-12; PX1 ¶ 13). The agreement could be terminated by either party upon three months' notice before the expiration of the initial two-year period, or upon three months' notice before the expiration of any one-year term thereafter. (PX1 ¶ 14).

Adipogen was a supplier of products in the life science research reagent field. (Tr. 78:3-79:9, 99:10-11, 996:9-11). Dr. Chappuis believed that Adipogen had excellent technology and products and was very innovative. (Tr. 111:14-112:7; *see also* D.I. 15 ¶ 10). Adipogen's products include specialty antibodies, proteins, biochemicals, and immunoassay kits used in life sciences research. (PX1 ¶ 1(a)). As was later disclosed in the Stock Purchase Agreement, Adipogen was burdened with heavy financial debt. (Tr. 169:12-22, 931:15-932:10; PX5 at ADIPOGEN-0005452).

9

The Exclusive Sales and Marketing Agreement was governed by Swiss law and disputes arising out of or in connection with the agreement were to be settled by a court of competent jurisdiction in Basel, Switzerland. (PX1 ¶¶ 22, 23).

## B. Appendix A

On or about November 17, 2006, Alexis and Adipogen entered into "Appendix A" to the Exclusive Sales and Marketing Agreement. (Tr. 115:13-116:16; PX4; Stip. Facts ¶ 37). Appendix A extended the term of the Exclusive Sales and Marketing Agreement until December 31, 2009, which could not be terminated early by Adipogen without penalties. (Tr. 116:23-117:3; PX4 ¶¶ 2, 5). Appendix A granted Alexis a "10% discount on all direct bulk orders to resellers in the U.S. Bulk orders are orders to a single customer equal or exceeding $30,000.00 (thirty thousand) per order or a single product order equal or exceeding $30,000.00 (thirty thousand)." Alexis agreed to pay $50,000 to Adipogen as consideration for Appendix A. (Tr. 116:17-119:23; PX4 ¶ 1). Dr. Chappuis and Dr. Youn signed Appendix A on behalf of their respective companies. (PX4).

Appendix A also provided: "In case of a change in ownership of ALEXIS Corporation the Agreement (incl. Appendix A) is transferable to the new owners." (Tr. 117:21-119:5; PX4 ¶ 4). Furthermore, "[i]n the case of change of ownership of AdipoGen before December 31, 2009 the Agreement (incl. Appendix A) must be absorbed and respected by the new owners of AdipoGen." (PX4 ¶ 3). This provision regarding change in ownership was included in Appendix A to "dress up" Alexis for a potential sale. (Tr. 117:21-119:23, 1022:15-1023:7).

Appendix A was signed before ELS purchased Axxora and its subsidiaries, and was disclosed to ELS during the due diligence process. (Tr. 115:8-116:16). Accordingly, the Alexis–Adipogen Exclusive Sales and Marketing Agreement (including Appendix A) remained in effect after the Stock Purchase Agreement closed. (PX4 ¶ 4; Stip. Facts ¶ 38; PX5).

10

## C.    Appendix B

In mid-2007, Dr. Youn approached Dr. Chappuis to determine whether ELS would be interested in making a significant investment in Adipogen because of financial difficulties that Adipogen was experiencing. (Stip. Facts ¶ 39; Tr. 1089:5-10). Dr. Chappuis brought Dr. Youn's request to ELS's President, Dr. Carl Balezentis. (Stip. Facts ¶ 40; Tr. 120:3-121:2, 224:16-225:12, 1089:11-1090:17). Dr. Chappuis also drafted an acquisition proposal for Adipogen and a financial analysis of such an acquisition, which Dr. Chappuis submitted to Dr. Balezentis on October 22, 2007. (Tr. 815:1-816:23, 1090:19-23; Stip. Facts ¶ 41). Adipogen had a heavy debt load and required financial assistance. (Tr. 933:13-17; PX5). ELS understood that Adipogen was an important supplier and that it carried heavy debt. (Tr. 933:13-17; PX5). ELS decided not to acquire Adipogen. (Tr. 121:3-11, 133:8-21, 817:8-20, 1091:4-10; PX14; Stip. Facts ¶ 42). ELS declined the proposed deal for it to purchase Adipogen because ELS "already had a very, very good supply agreement without buying the company, so [ELS] had no interest in doing so." (Tr. 120:19-121:2). Instead, ELS approved a $150,000 payment from Alexis to Adipogen in exchange for strengthened rights to Adipogen products. (Tr. 121:12-128:24; PX14; PX16).

This agreement was memorialized in Appendix B to the Exclusive Sales and Marketing Agreement, dated January 1, 2008. (Tr. 121:12-128:24; PX15; Stip. Facts ¶ 43). Dr. Chappuis signed Appendix B on behalf of Alexis and Dr. Youn signed on behalf of Adipogen. (PX15; Stip. Facts ¶ 45). Among other things, Appendix B extended the Exclusive Sales and Marketing Agreement until December 31, 2011, required Alexis to pay $150,000 to Adipogen, and granted Alexis (later ELS AG) worldwide exclusive distribution rights to sell Adipogen's products, except for Korea, Japan, and two specific OEM customers in the U.S. (PX15 ¶¶ 1-3; Tr. 283:11-17).

11

Appendix B further provided that if the agreement were terminated before December 31, 2011, Alexis would be entitled to compensation in the amount of its "lost margins." (PX15 ¶ 6). Paragraph 4 of Appendix B stated, "In the case of change of ownership of AdipoGen, Inc. before December 31, 2011 the Agreement (incl. Appendix A and B) must be assumed and respected by the new owners of AdipoGen, Inc." (Tr. 1189:1-7; PX15 ¶ 4). Paragraph 5 read: "In case of change of ownership of ALEXIS Corporation the Agreement (incl. Appendix A and B) is transferable to the new owners." (PX15 ¶ 5).[5]

Paragraph 9 of Appendix B provided that Adipogen would transfer to Apotech, upon request, certain technical manufacturing information and the identical clones for the monoclonal antibodies which are used in selected commercially available ELISA Kits, or, if polyclonal antibodies were used, Adipogen would provide sufficient bulk material free of charge. (PX15 ¶ 9).

Paragraph 9(c) of Appendix B granted Alexis the right to sell the seven (7) selected ELISA Kits and paragraph 9(g) provided Apotech the right to manufacture the seven (7) selected ELISA Kits. Paragraph 9(b) also gave Apotech the right to "produce monoclonal antibodies (transferred under Appendix B) and the corresponding CE labeled ELISA Kits." (PX15 ¶ 9(b)).

Under Appendix B, Alexis/ELS AG and Apotech were also granted the right to use the supplied clones or antibodies to produce, market, and sell the antibodies and corresponding ELISA Kits under Apotech's own branded label. (PX15 ¶ 9(c)). For each ELISA Kit sold, Adipogen was entitled to a 15% royalty. (*Id.* ¶ 9(d)).

Before Dr. Chappuis entered into Appendix B, he discussed its terms with, and sought the approval of, ELS management. (Tr. 122:24-123:17, 223:8-225:17, 1101:7-10, 1092:20-1093:1;

---

[5] Although Appendix B was entered into eight months after ELS acquired Alexis and Axxora, Alexis was still known as Alexis rather than as ELS AG.

12

PX14). Dr. Rabbani testified that he "fully discussed" Appendix B with Dr. Balezentis and participated in coming up with the "principal framework" of the agreement. (Tr. 122:24-129:1, 223:8-225:12). After considering the proposal, ELS management authorized Dr. Chappuis to sign Appendix B. (Tr. 121:12-129:1; PX14; PX16). The first $80,000 portion of the $150,000 payment was made upon signature as required by Appendix B. (Tr. 1093:2-15). Dr. Chappuis also approved transferring the second $70,000 to Adipogen even though Adipogen had not transferred all of the materials and know-how described in Paragraph 9 of the agreement. (Tr. 1093:16-1094:14). Dr. Chappuis testified that he authorized the $70,000 payment. (Tr. 1093:10-15). According to Dr. Chappuis, some know-how was transferred, and that triggered the payment obligation even though no material had yet been transferred. (Tr. 1094:10-14).

## IV.    **CHAPPUIS'S INOXXIS INVESTMENT FUND**

On August 17, 2007, Dr. Chappuis sent an email[6] to Elliot Feuerstein[7] stating that he planned to visit San Diego (where Mr. Feuerstein lived) in September 2007. The email stated, "Things at [ELS] are going well . . . . In the meantime my 'special fund project' is becoming more concrete and you might be interested to look at that." (Tr. 346:15-22; PX10; Tr. 343:20-348:23; PX10). Dr. Chappuis testified that the "special fund project" referenced in this email "might be" the project that "ultimately led to Bioaxxess." (Tr. 1102:14-24). Dr. Chappuis asked for a meeting with Mr. Feuerstein while Dr. Chappuis was visiting San Diego. (Tr. 346:6-14; PX10).

On March 13, 2008, Dr. Chappuis exchanged emails with Olivier Donzé, the site manager at Apotech. (Tr. 207:11-17, 349:1-350:23; PX20). Dr. Chappuis asked Mr. Donzé for

---

[6] This email was later discovered by ELS, along with the other emails discussed below, during an internal investigation conducted by ELS after restoring Dr. Chappuis's deleted emails in the fall of 2010. (Tr. 344:19-22).
[7] Feuerstein's trusts' shares were cashed out when ELS purchased Axxora, along with the other Axxora investors. (PX5 Schedule II).

13

a meeting on March 27, 2008 at Apotech's site in Lausen, Switzerland. Mr. Donzé asked, "Will Enzo people be present that day at Alexis! [sic]." Dr. Chappuis replied, "No Enzo people are present." (Tr. 349:1-350:23; PX20). On March 14, 2008, Dr. Chappuis emailed Mr. Feuerstein and asked him for another meeting in San Diego the following month. (Tr. 350:24-353:3; PX21). Dr. Chappuis's proposed agenda included "[i]nformation on the new 'Inoxxis Investment Fund.'" (Tr. 352:16-22; PX21). Dr. Chappuis also forwarded his exchange with Mr. Feuerstein to Craig Andrews, a lawyer in San Diego, who served as Axxora's and Dr. Chappuis's counsel, and was also himself an Axxora investor who had cashed out when ELS purchased Axxora. (Tr. 353:4-11; PX21; PX5 Schedule II).

Dr. Chappuis then sent a separate email to Mr. Andrews asking to meet with him while Dr. Chappuis was in San Diego in April "to discuss seriously my (our) project of the 'Inoxxis Investment Fund.'" (Tr. 353:12-356:13; PX22). Dr. Chappuis suggested to Mr. Andrews, "Maybe we can meet after the breakfast together with Tamara in your office." (Tr. 355:17-356:14; PX22). The reference to "Tamara" was to Ms. Sales. (Tr. 355:17-356:10). On April 15, 2008, Dr. Youn of Adipogen wrote to Dr. Chappuis concerning "a confidential matter on AdipoGen." (Tr. 359:1-5; PX24). Dr. Youn stated that he was "preparing for meeting you at personal level" and that he had "contacted two major owners of AdipoGen, basically agreeing upon making a third company based in the US." (Tr. 359:6-20; PX24). Dr. Youn further stated, "Stock exchange between AdipoGen and the third company would be the first choice whereas total buying out AdipoGen is the next one." (Tr. 359:15-20; PX24).

With respect to the ELISA Kits, Dr. Youn stated, "I would like to go through CE-labels for these new series of competitive ELISA kits independently of ApoTech. This process will be targeted to our future collaboration." (Tr. 360:19-361:8; PX24). Dr. Youn closed his email by

14

stating, "I would like to make sure that all future communications will be personal and confidential based upon the sincere fact that you know who I am and I know who you are." (PX24).

By emails dated May 7 and 8, 2008, Dr. Chappuis and Dr. Youn arranged a meeting in June 2008 at Newark Airport, which was while Dr. Chappuis would be in the New York for ELS management meetings. (Tr. 364:5-366:12; PX26). In this email exchange, Dr. Chappuis stated, "I herewith confirm our tentative meeting on June 9-10 or June 10-11 in Newark to discuss and hopefully somehow launch our big project." (Tr. 365:3-16; PX26). In his reply, Dr. Youn asked Dr. Chappuis if Dr. Chappuis had a "personal email accoun[t] that can be shared with me." (Tr. 366:21-367:7; PX26).

Dr. Chappuis and Dr. Youn met at Newark Airport as planned. (Tr. 1105:6-1106:4). During the same trip, Dr. Chappuis also attended a meeting at ELS's headquarters in Farmingdale, New York regarding the integration and consolidation of ELS. (Tr. 365:17-366:12). Dr. Chappuis did not disclose to ELS his meeting or communication with Dr. Youn. (Tr. 366:13-20, 1105:6-1106:4).

On May 30, 2008, Dr. Youn emailed Mr. Graner and Dr. Chappuis "the files you have requested, reflecting all the details of AdipoGen." (Tr. 367:20-369:23; PX29). Dr. Youn stated, "We do hope that all these information would lead to 'a reasonabl[e] and precise valuation' of AdipoGen." (Tr. 370:17-371:16; PX29). Dr. Chappuis then forwarded Dr. Youn's email to Ms. Sales at her personal email address on June 4, 2008. (Tr. 369:24-371:16; PX29). The next day, June 5, 2008, Ms. Sales sent a letter to ELS resigning her position as Vice President of Finance and Administration at Axxora, and declaring that her final day at the company would be July 3,

15

2008. (Tr. 198:4-5, 371:17-373:22, 1169:16-1170:12; PX30). Ms. Sales resigned in order to spend more time with her family. (Tr. 1169:16-1170:12; PX30).

On June 23, 2008, Dr. Chappuis emailed Mr. Andrews, copying Ms. Sales at her personal email address, stating that "[t]he project 'Inoxxis' is progressing"; "[t]he deal (mutual understanding) with AdipoGen stands"; "[f]inancing of Inoxxis moves nicely forward"; and "[a] Business Plan is in the process of being established." Dr. Chappuis also asked Mr. Andrews to recommend a lawyer in Korea. (Tr. 373:23-376:19; PX31). On June 29, 2008, Dr. Chappuis sent an email to Mr. Graner in anticipation of a week-long trip that Dr. Chappuis and Mr. Graner would make to Korea to visit Adipogen beginning on July 19, 2008. (Tr. 376:20-378:17; PX32). In his email, Dr. Chappuis set out an itinerary and various tasks, including: "July 19th: Meeting with Byung [Youn] (discuss details of Business Plan (Financials))"; "July 21st or 22nd: Meeting with Mr. Lee (to be confirmed by [Byung])"; "July 21st/22nd (or 23rd): Meeting with Lawyer . . ."; "July 21st-23rd: Refine Business Plan." (PX32).

On July 6, 2008, in anticipation of his trip to Korea, Dr. Chappuis sent an email to Dr. Youn titled "Supplemental Due Diligence List AdipoGen, Inc." (Tr. 383:16-385:2; PX35). This email refers to the "investment of Inoxxis" in Adipogen and requests detailed financial and operations information about Adipogen "to assure the timely continuation of our investment project (incl. the preparation of a Business Plan) and to guarantee efficient discussions when Jürgen [Graner] and I are visiting Seoul July 17-23, 2008 following a supplemental request for information as discussed before." (Tr. 385:3-386:13; PX35). Dr. Chappuis forwarded the email to Ms. Sales and Mr. Graner. (Tr. 385:8-11; PX35).

Dr. Chappuis emailed reports to ELS AG on every meeting he attended on the trip, except for his meetings with Adipogen. (Tr. 794:6-21, 795:19-800:2, 800:21-811:6, 915:17-

16

916:22; DX125-130). Dr. Chappuis invoiced ELS AG for this trip as travel and entertainment. (Tr. 378:18-383:15; PX33). Dr. Chappuis traveled to Asia in part to promote and further ELS's business interests in the region. (Tr. 954:1-957:165; DX125-130).

On July 27, 2008, Ms. Sales (then no longer employed by Axxora) emailed Dr. Chappuis, Mr. Andrews, and Mr. Graner, attaching the Axxora Operating Agreement, stating, "Attached is the document we used to form Axxora, LLC." (Tr. 386:14-389:7, Tr. 1164:10-13; PX37). Ms. Sales then discussed the "formation of Inoxxis" and how it could be structured to avoid certain tax issues that Axxora had encountered. (*Id.*). On July 28, 2008, Mr. Graner sent Dr. Chappuis an email with the subject line: "New Company Name," which listed various domain names that Mr. Graner had reserved. (Tr. 389:8-391:1; PX38). Mr. Graner's email noted that he has "already requested the input of Byung and Tamara regarding the company names." (Tr. 390:15-19; PX38). Ms. Dettwiler weighed in on the selection of a new company name by forwarding Mr. Graner's email from Dr. Chappuis's ELS AG email address to his personal email address, stating: "Hello, Georges. Attachment for your information. Apropos: Everything that is Adipro . . . I don't like. Regards, sd." (Tr. 391:2-24, 392:10-21; PX38).

On July 29, 2008, Mr. Graner emailed Dr. Chappuis, copying Ms. Sales, an outline of key points of a proposed Inoxxis buyout of Adipogen. (Tr. 393:23-396:21; PX39). Mr. Graner's proposal stated, "Inoxxis will invest a total of USD 4 million into AdipoGen." (Tr. 394:21-395:2; PX39).

In discussing Alexis's Exclusive Sales and Marketing Agreement with Adipogen, Mr. Graner stated that Inoxxis's investment in Adipogen is "dependent on a renegotiation of the deal terms with Alexis Corporation. Since Inoxxis will provide a significant amount of funds to

17

AdipoGen, it cannot tolerate an exclusive arrangement for all AdipoGen products anywhere outside of Korea and Japan." (Tr. 395:7-18; PX39).

## V.    THE ADIAGEN INVESTMENT MEMORANDUM

On October 6, 2008, Dr. Chappuis sent an email to a representative of another former Axxora investor, Semely Conseil & Gestion SA. (Tr. 396:22-397:13; PX41; PX5 Schedule II). Dr. Chappuis attached an investment memorandum, dated September 26, 2008 ("the Investment Memorandum"), for an entity called "AdiaGen Holding Corporation," a Swiss company. (Tr. 398:6-399:7; PX41-42). According to the Investment Memorandum, a group of "international investors" planned to invest $4 million into the new company, which would wholly own the existing Adipogen and future Swiss and U.S. subsidiaries. (Tr. 400:2-402:23; PX41-42 at 3, 11). These "international investors" were the former Axxora investors. (PX5 Schedule II).

The Investment Memorandum touted the benefits of combining Adipogen with the proposed new Swiss and U.S. entities. The principal benefits would include access to technology, products, and a marketing and sales force. (Tr. 401:12-408:9; PX41-42). The products that "AdiaGen" proposed to sell through the new Swiss and U.S. entities were products already in ELS AG's catalog and then being sold by ELS AG. (Tr. 403:4-408:9; PX42 at 4, 6). The Investment Memorandum indicated that "AdiaGen" intended to distribute Adipogen's products directly. (Tr. 405:21-406:13; PX42 at 3, 5). The Investment Memorandum stated, "Key steps to increase global market visibility, which increases global sales volumes," included "[e]stablish[ing] and actively manag[ing] a worldwide specialized distributor network in key markets." (PX42 at 6). It predicted in a financial forecast that "[t]he significant increase in gross margin between 2011 and 2012 is due to the fact that from January 1, 2012 onwards AdiaGen Holding handles the distribution of products manufactured by former AdipoGen directly." (Tr. 405:21-406:13; PX42 at 8).

18

The Investment Memorandum touted the expected return to the shareholders of more than 2.4 times their original investment. According to the Investment Memorandum, "The conservative expected sales multiple by the end of 2013 is 1.5 times sales, therefore resulting in an approximate exit value after 5 years of approximately USD 12-14 million (conservative)." (PX42 at 11; Tr. 407:2-17). The Investment Memorandum further emphasized the profitability of ELISA kits, stating, "In the field of *in vitro* diagnostic kits (CE labeled) and *in vivo* diagnostic kits (out-licensing) exists extraordinary growth potential." (Tr. 408:4-9; PX42 at 11).

Dr. Chappuis did not disclose to Dr. Balezentis his Bioaxxess investment and plan to take over Adipogen. (Tr. 1124:16-20).

## VI. BIOAXXESS IS FORMED AND BIOAXXESS ACQUIRES A MAJORITY INTEREST IN AND CONTROL OVER ADIPOGEN

In late 2008, Dr. Chappuis and the other Individual Defendants changed the name of the corporate vehicle they would use to purchase Adipogen to Bioaxxess, Inc. ("Bioaxxess"). (Tr. 411:4-8). Dr. Chappuis used ELS AG resources to help him set up Bioaxxess. (Tr. 1103:8-13).

On or about February 10, 2009, Bioaxxess filed a Certificate of Incorporation with the Secretary of State of Delaware. (Tr. 417:7-418:6; PX51; Stip. Facts ¶ 11). On March 12, 2009, Dr. Chappuis emailed Mr. Andrews, stating: "We need to move forward with the establishment of Bioaxxess, Inc. At the moment exists some momentum (again) which we should not [lose]." (Tr. 1113:10-16; PX55). On March 19, 2009, Dr. Chappuis sent an email to Mr. Andrews, Ms. Sales, and Mr. Graner with the subject line "Update/Summary of Open Issues Bioaxxess, Inc. & AdipoGen Deal." (Tr. 1113:17-1114:1; PX57). In this email, Dr. Chappuis gave specific instructions to Mr. Andrews concerning Bioaxxess's formation and future business. (Tr. 1114:12-23; PX57).

19

First, under "Board," Dr. Chappuis listed: "Craig Andrews (Chairman), David Ramsey, Georges Chappuis (CEO) (after June 1, 2009)."[8] (PX57). Dr. Chappuis confirmed that he in fact intended to become the CEO and a board member of Bioaxxess. (Tr. 1115:6-9). In this email, Dr. Chappuis also identifies Ms. Sales as "Secretary & Treasurer (+CFO)" of Bioaxxess and a board member of Adipogen. (Tr. 1115:10-13; PX57). In reference to Bioaxxess, Dr. Chappuis further wrote: "US Bank Account: May I ask Tamara to open a bank account (with the support of Craig)." (Tr. 1115:14-19; PX57).

On March 21, 2009, Dr. Chappuis sent an email to his lawyers, including Mr. Andrews, with the subject line "Open Issues Bioaxxess, Inc. - Urgent." (PX60). In that email, Dr. Chappuis stated, "Due to great work by [Mr. Graner] and Marty [Lorenzo, a partner of Mr. Andrews,] the AdipoGen Deal is almost done and ready to be executed." (Tr. 419:6-420:1; PX60). Dr. Chappuis stated, "We need now to finalize the establishment of Bioaxxess, Inc. asap," which included opening a bank account, issuing stock certificates, and "[s]igning the AdipoGen Deal on behalf of Bioaxxess." (Tr. 420:5-17; PX60).

According to Dr. Chappuis, Ms. Sales was to be "the lead," but he cautioned that she should not sign any stock certificates of Bioaxxess as President until the end of May 2009, which is when the non-competition and non-solicitation period of the Stock Purchase Agreement expired. (Tr. 420:22-421:22, 1117:4-13; PX60). In the alternative, Dr. Chappuis asked: "Could Craig Andrews sign as Chairman?" (PX60). Ms. Sales's involvement in the formation of Bioaxxess included receiving investor funds, setting up bank accounts, working with the lawyers to set up the corporate structure, and circulating board of director meeting binders. (Tr. 1175:10-1176:3, 1198:15-1199:14).

---

[8] The Court does not believe it is a coincidence that the non-compete and non-solicitation clauses expired May 31, 2009.

20

Copies of the Bioaxxess Securities Purchase Agreement were executed by all of the purchasers of Bioaxxess stock, including Dr. Chappuis, Ms. Dettwiler, Mr. Donzé, Mr. Feuerstein, Mr. Andrews, and other former investors in Axxora. (PX142; PX215; Tr. 1119:21-23). With the formation of Bioaxxess on March 31, 2009,[9] Ms. Sales assumed the role of its Chief Financial Officer. (Tr. 1194:18-24). Dr. Chappuis was named to the Board of Bioaxxess. (Tr. 1125:21-1126:1, 1201:20-1202:13). Attorneys Andrews and Lorenzo were taking direction from Dr. Chappuis and, to a lesser extent, Ms. Sales. (PX55; PX57; PX60; PX93; PX101; PX132; PX134).

The same day, March 31, 2009, Bioaxxess purchased a controlling interest in Adipogen. (Tr. 1122:9-12). Forwarding wiring instructions to facilitate the payment from Bioaxxess to Adipogen, Mr. Lorenzo asked Dr. Chappuis, "[w]hen do you expect the Investors to wire their funds?" and reminded Dr. Chappuis that "[t]he Adipogen transaction documents currently contemplate that Bioaxxess will pay the entire purchase price ($2.3 MM) at one time . . . ." (Tr. 423:15-424:18; PX77). Mr. Lorenzo attached signature pages for the Bioaxxess Securities Purchase Agreement and Investors Rights Agreement, each of which identify Ms. Sales as the Chief Financial Officer of Bioaxxess. (Tr. 424:11-18; PX77).

On April 19, 2009, Dr. Chappuis sent Mr. Donzé an email stating that the "financing of Bioaxxess, Inc. is successfully closed." (Tr. 424:19-426:13; PX93). Dr. Chappuis thanked Mr. Donzé for his $80,000 investment in Bioaxxess and requested that he mail copies of his signature pages for the Bioaxxess investment documents to Dr. Chappuis at Adipogen, Industriestrasse 17, CH-4415 Lausen, Switzerland, which was the address for ELS AG. (Tr. 426:14-427:3; PX93).

---

[9] The agreement is dated April 1, 2009. (PX142).

21

Adipogen remained an important vendor to ELS AG until 2012, when it became uneconomical for ELS AG to purchase Adipogen's products. (Tr. 607:8-608:24). After ELS acquired Biomol and Assay Designs, Adipogen was a supplier of one ELS subsidiary (ELS AG) and a competitor of others. (Stip. Facts ¶¶ 46-49; Tr. 1009:10-1010:21; *see also* D.I. 15 ¶ 17; D.I. 71-5 ¶ 11). Specifically, at that time, Biomol and Assay Designs, wholly owned subsidiaries of ELS, both sold products that competed with Adipogen's products. (Tr. 435:20-436:9, 1009:23-1010:20; Stip. Facts ¶ 49; D.I. 15 ¶ 17). Neither Biomol nor Assay Designs were Acquired Companies as defined in the Stock Purchase Agreement, as they were not subsidiaries of Axxora. (PX5, Art. IX).

In May 2009, during the same time period as the Apotech closure (*see infra*), Ms. Dettwiler and Dr. Chappuis changed Adipogen product numbers so that they matched the ELS AG product numbers. (Tr. 441:22-442:18, 446:12-451:22; PX105; PX127). Changing Adipogen product numbers so that they matched ELS AG product numbers enabled Adipogen and its affiliates to capture business from ELS AG because, for example, a customer searching for a particular ELS AG product number on the Internet would also find the identical Adipogen product number, and thus be able to order the same product from Adipogen rather than ELS AG. (Tr. 442:19-443:10).

## VII. CHAPPUIS CIRCULATES BUSINESS INFORMATION TO BIOAXXESS OFFICERS AND INVESTORS

Dr. Chappuis testified that he forwarded an email dated May 30, 2009, which included the Apotech project plan spread sheet (PX116), to Tamara Sales. (Tr. 1141:22-1142:6). He explained, she "in her [he]art, was the financial controller of Apotech in the past. There was a lot of accounting issues with the production company [*i.e.*, Apotech], and when I sent her this, it was only on a gossip level, as you do that when you work for a long time closely with a person. I

22

would say, and I admit that, seeing it in this situation, this was maybe wrong, but it had clearly nothing to do with Bioaxxess." (Tr. 1142:22-1143:7). Dr. Chappuis sent this email to Ms. Sales approximately one year after she had left Axxora and while she was CFO of Bioaxxess.

Similarly, on March 28, 2009, Dr. Chappuis received an email from ELS's President, Dr. Balezentis, summarizing a recent high-level ELS management strategy meeting and attaching "Strategic Operations Meeting Documents." (Tr. 453:2-454:19; PX63-67). The email also laid out confidential ELS planning, including "organization structure," "[c]ommunications to employees guideline," and "[n]ext steps." (PX63-67). The attached "Strategic Operations Meeting Documents" were also confidential. (*Id.*; Tr. 455:18-459:21). They concerned in part the future operations of Axxora, ELS AG, and Apotech. (PX63-67).

Dr. Chappuis then forwarded these business plans to several Bioaxxess investors, including Mr. Dittrich (an ELS AG employee and Bioaxxess investor) (Tr. 459:22-461:4; PX65; PX215 Exhibit A), Mr. Traina (an ELS AG employee and owner of Bioaxxess restricted stock, who left ELS AG in May 2009 and became the marketing manager at Adipogen) (Tr. 461:7-462:8; PX66; PX215 Exhibit A), and Mr. Donzé (the Apotech site manager who would later form Inoxxis SA, which became Adipogen SA) (Tr. 462:20-463:18; PX67; PX215 Exhibit A). Georges Chappuis also forwarded the email to Maurizio Marconcini, who was the number one ELS AG distributor in Europe and, at the time, an advisor to ELS AG on the pulse of the market. (Tr. 458:23-459:21; 974:12-18). Marconcini was also an investor in Bioaxxess. (PX215 Exhibit A). All the other individuals to whom George Chappuis sent the email worked at ELS AG and were involved in internal marketing. (Tr. 974:24-975:2). They were also all investors in Bioaxxess. (PX215 Exhibit A).

23

## VIII. THE APOTECH SITE CLOSURE

Apotech – the other relevant Axxora subsidiary acquired by ELS in addition to Alexis –
manufactured certain antibodies, proteins, and assay kits using proprietary cell lines, clones, and
other materials at a laboratory in Epalinges, Switzerland. (Tr. 206:24-207:3, 465:16-466:1). On
March 28, 2009, Dr. Rabbani, CEO of ELS, made the decision to discontinue the Apotech brand
and close the lab. (PX63 at ENZO0097104, ENZO0097122; Tr. 738:21-740:2, 206:19-23,
208:3-5, 210:11-13). All the employees of Apotech, including Oliver Donzé, the site manager,
were terminated without any future obligation to ELS. (Tr. 210:17-21, 1229:11-12, 836:21-24,
754:23-24).

Georges Chappuis did not participate in the decision to close the Apotech lab. (Tr.
208:3-7). However, Dr. Chappuis was at the March 28, 2009 strategic planning meeting where
the decision was made and he was given responsibility for managing the Apotech "fade . . . out"
and the "transfer [of] know-how to Assay Designs." (Tr. 455:10-12; PX63 at ENZO0097122).
Dr. Chappuis raised several considerations concerning the Apotech closure, including securing
product. (DX66). Ian Varndell was appointed by ELS to oversee the transition. (Tr. 471:2-8).
Dr. Chappuis, Ms. Dettwiler, and Mr. Donzé were responsible for sending Mr. Varndell a
complete product transfer list. (PX102; PX104; PX106; PX109; PX110; PX111; PX112;
PX113; PX114).[10]

On March 30, 2009, Dr. Chappuis forwarded to Mr. Donzé the Strategic Operations
Meeting Documents, which discussed the phase out of Apotech and closure of the lab. (PX67 at

---

[10] Neither Mr. Varndell nor Mr. Donzé testified at trial. Statements they made as part of a Swiss proceeding were
mostly too general to be of much use. The docket in this case reflects no attempt to obtain any testimony from them.
Plaintiff's witness about the Apotech closure, Andrew Whiteley, while quite credible, had no first-hand knowledge
of what happened.

ENZO0097236, ENZO0097254). In June 2009, ELS notified Mr. Donzé, Apotech's site manager, of ELS's decision to close Apotech. (Tr. 207:11-17; 210:11-18).

Both consigned and non-consigned products were stored at the Apotech labs. (Tr. 1222:19-24; PX102; PX106; PX109; PX110; PX111; PX112; PX113). Consignment products were recorded in ELS's computer system called Navision, and were assigned zero value, since ELS AG did not own them. (Tr. 1222:19-22; 1223:13-14). However, ELS AG had control over the consignment products and could sell them for a profit, subject to paying a royalty back to the product owner. (Tr. 482:13-483:4; 846:17-20).

ELS intended to use some of the Apotech assets in Assay Designs' laboratories in Michigan and elsewhere to manufacture ELISA Kits for sale and distribution worldwide, including in the United States. (Tr. 208:15-20, 209:20-210:10, 466:2-467:7).

Thomas Heller was an ELS AG employee in charge of purchasing. (Tr. 1222:13-14). He testified that Ms. Dettwiler was in charge of the product transfer. (Tr. 1222:15-19). Mr. Heller testified, "There was merchandise on consignment at Apotech in Epalinges." (Tr. 1222:19-20). One of the products that was not transferred was a megaligand known as MegaCD40L, the rights of which were owned by Apotech through agreements with the University of Lausanne, Professor Tschopp, and another company called Apoxis. (Tr. 477:14-22, 479:7-480:4, 579:12-580:3). The Tschopp Group were researchers who consigned cell lines to Apotech. (Tr. 1250:11-16). Pasqual Schneider, an employee of the Tschopp Group, testified with respect to megaligands that, "The producing cells remained the property of Apoxis." (Tr. 1253:19-20).

On May 17, 2009, Dr. Chappuis emailed Mr. Andrews and Ms. Sales an "Update." (PX101). Under the topic of "Enzo," Dr. Chappuis stated: "I am allocated huge responsibilities (and corresponding workload). Actions and an exist [sic] strategy must be established. I like to

25

talk to you about this next time we meet." (PX101; Tr. 1136:2-17). Next, under the heading "Bioaxxess," Dr. Chappuis wrote: "Many-many opportunities which need more and more of my time. Also an issue to attach. I like to talk to you about this next time we meet." (PX101; Tr. 1136: 18-24). Finally, as to "Apotech," Dr. Chappuis stated: "The Board of Enzo did not accept the LOI (even though Carl did). En[z]o submitted a counterproposal but Olivier declined (with my full support). We are now in the process of executing the contingency plan. I will inform you in detail under separate cover or personally if we meet soon." (PX101; Tr. 1137:1-20).

That same day, Ms. Dettwiler emailed Mr. Donzé, copying Dr. Chappuis, attaching "the actual Apotech product list." (PX102). Ms. Dettwiler requested that Mr. Donzé "work on it as discussed." (Tr. 472:6-474:15; PX102). In addition, that day, Dr. Chappuis emailed Mr. Donzé, stating, "We are working on the Apotech Product List as discussed." (Tr. 475:11-476:1; PX104). Mr. Donzé responded, explaining that Professor Tschopp was writing an article for *Nature* – an important life sciences periodical – which refers to MegaCD40L (human). Mr. Donzé recommended that Professor Tschopp instead use AdipoQ-CD40L, which "sounds like Adipogen." (Tr. 476:6-478:12; PX104). Mr. Donzé further noted: "MegaCD40L should not be transferred to Enzo and thus should disappear." (Tr. 479:1-6; PX104).

On May 19, 2009, Mr. Donzé emailed Ms. Dettwiler, copying Dr. Chappuis, three documents: "1) List of products minus licensing products not to transfer (List for Ian); 2) List of all licensing agreements (royalties review); 3) List of products to be transferred for the 'project.'" (Tr. 480:5-482:1; PX106). Mr. Donzé's email stated that he "marked in red products that should not be transferred for different reasons," including "consigned products." (Tr. 482:2-12; PX106). Consigned goods were not owned by ELS AG; ownership remained with the consignor. (Tr. 729:8-13; 730:1-5; 730:7-12).

26

Mr. Donzé's May 19, 2009 email to Ms. Dettwiler listed three products that "we should try not to transfer for reasons to find (licensing or else)." (PX106). These products included MegaCD40L, Soluble (human) (rec); Mega CD40L, Soluble (mouse) (rec); and IL-35 (human):Fc (human) (rec). (PX106; Tr. 483:22-484:3). Olivier Donzé testified that the cells used to produce the megaligand products were consigned products that were not transferrable. (Tr. 1237:7-13). Mr. Donzé and Ms. Dettwiler compiled a list of Apotech products and inserted them into a spreadsheet with certain products marked by Ms. Dettwiler in red, which she forwarded to Dr. Chappuis in an email on May 20, 2009. (Tr. 485:16-487:7; PX109).

Carl Balezentis requested that Silvia Dettwiler support Olivier Donzé with the product list. (Tr. 1291:12-18). Silvia Dettwiler testified that she did not make any determinations regarding which products to transfer, nor did she have the authority to do so. (Tr. 1297:1-12). The documents, however, show that she and Dr. Chappuis were both involved in creating the Apotech product transfer list, removing products from that list, and recording reasons for not transferring product. (PX102; PX104; PX106; PX109; PX110; PX111; PX112; PX113; PX114). According to Ms. Dettwiler's list, the red coloring meant do "not to transfer to Ian," Ian being Mr. Varndell. (Tr. 485:16-487:8; PX109).

On May 24, 2009, Dr. Chappuis sent an email thanking Mr. Donzé for his efforts and laying out discussion points for a telephone discussion during which Dr. Chappuis, Ms. Dettwiler, and Mr. Donzé would finalize the list, which would contain "only the essential information" for Mr. Varndell and Assay Designs. (Tr. 487:8-489:13, 1137:21-1138:15; PX110). Dr. Chappuis further stated in his email that they should "[e]stablish a strategy for the bulk quantities" and "the transfer of ELISA kits/sets." (Tr. 489:23-491:8, 1138:19-1139:4; PX110). Dr. Chappuis also stated that they should discuss during their telephone conversation

27

how to "[e]stablish argumentation (e.g. Apotech was packaging for [Alexis] only)" to explain why certain products were not transferred. (Tr. 492:10-494:22; PX110). Mr. Donzé responded thanking Dr. Chappuis and Ms. Dettwiler for "the huge work done on Apotech closure." (PX110). That same day, Mr. Donzé emailed Dr. Chappuis and Ms. Dettwiler a color-coded list of products, including products not to be transferred to ELS "marked x." (Tr. 493:6-495:24; PX111).

On May 25, 2009, Ms. Dettwiler circulated to Dr. Chappuis and Mr. Donzé a revised color-coded list of products, requesting of Dr. Chappuis and Mr. Donzé, "Please review one last time. If o.k we eliminate those with (x) and construct a final list." (Tr. 496:1-497:9; PX112). Later that day, Dr. Chappuis sent to Mr. Varndell the final Apotech product transfer list, with the products previously "marked x" removed. (Tr. 500:4-501:19; PX113). Mr. Whiteley testified that various products were not transferred to an ELS facility. (Tr. 501:21-503:6; PX113A). Mr. Varndell was unaware that any products had remained at the Apotech site. (Tr. 845:17-846:3, 1263:7-24). Mr. Donzé explained, "Some of the products in reality belonged to Alexis and were simply stored at Apotech, which is why Ian Varndell probably never heard about them. Further, some of the technical solutions used by Assay Design were prohibited in Switzerland," to which Ian Varndell responded, "Yes, that's true."[11] (Tr. 1264:1-9).

Dr. Chappuis and Mr. Donzé discussed reasons for not transferring product. For example, in an email to Dr. Chappuis dated May 28, 2009, Mr. Donzé stated, "If Ian or Carl are asking for the missing MegaCD40L (h+m) in the transfer list, we can argue that in the contract

---

[11] There was a colloquy between Mr. Varndell and Mr. Donzé in a Swiss proceeding. Something may have been lost in the translation from German to French and then to English, as the testimony shows the two agreeing on the explanation. The explanation, however, makes no apparent sense. If something were used in the United States, but prohibited in Switzerland, I would expect it would not be at the Apotech lab, and thus it would not be an issue whether it would be transferred to the United States. It seems to me that Mr. Donzé said something that made sense to Mr. Varndell, but I doubt that it could have been what actually appears in the transcript.

28

these proteins cannot be transferred (see attached document in the section 'affiliate'). I can say that I was waiting for the closure conditions before disclosing this 'important' issue." (Tr. 506:16-507:8; PX114).

In an email dated May 29, 2009, Mr. Varndell provided various ELS personnel, including Dr. Balezentis, with a report of his site visit to Apotech on May 26-27, 2009. (PX116). Mr. Varndell reported, "SD and GC provided IV with a full list of products manufactured by Apotech, together with historic sales data, inventory on hand as at 30 April 2009 and an indication of the products that required manufacture/stocking prior to closure. IV performed cross-checking of the list and made minor amendments (or sought clarification from OD) to the list." (PX116 at ENZO0000283). Apotech was scheduled to close for business on August 1, 2009. The "cell lines" were to ship in late June and early July, and manufacturing was to end on July 15, 2009. (*Id.* at ENZO0000280)

In an email dated June 4, 2009, Mr. Donzé (copying Dr. Chappuis) informed Dr. Youn of Adipogen that "two new products should be introduced at Adipogen"; specifically, "MegaCD40L (mouse) and (human)," which would be renamed with the Adipogen product numbers "AdipoQ-CD40L (mouse) or (human)." (PX122; Tr. 581:14-582:24).

The "action plan" included introducing these two new products "in the Alexis (ELS AG) website as soon as possible with new numbering for Adipogen (ask Silvia or Georges)." (PX122). In addition, Mr. Donzé noted, "Silvia will send you the data sheets for both products to add this product to the Adipogen websites (you can modify the data sheets in such a way it resembles to Adipogen data sheets)." (PX122). Finally, Mr. Donzé wrote: "I will send you next week through ELS AG 20 vials of each product to label them and send them back to Alexis for sales." (PX122; Tr. 582:18-24).

29

On July 20, 2009, Mr. Graner, copying Dr. Chappuis, wrote to Sung-Wook Lee, the investor representative for Adipogen, attaching the current and proposed corporate structures for Adipogen. (Tr. 432:24-535:13; PX130). Under the "Proposed Structure" section, the document stated: "Bioaxxess, Inc. is funding the establishment of Apotech as a separate entity from Enzo Biochem in Switzerland. This new entity entailing all key intellectual assets from former Apotech (except the old Enzo/Alexis products) is being renamed AdipoGen Corp." (PX130; Tr. 434:18-435:13). The "Proposed Structure" further states, "AdipoGen Corp. is being merged with AdipoGen, Inc. under a US Holding structure. All products from AdipoGen Corp. are being sold under the AdipoGen brand name." (PX130; Tr. 435:1-13).

On August 1, 2009, Apotech was closed and all its employees were terminated. (Tr. 206:19-23, 210:13, 1229:8-12). The Apotech lab was closed, but Apotech as a legal and financial entity was merged into ELS AG. (Tr. 539:10-16, 543:11-24). Mr. Donzé's employment ended soon thereafter. (Tr. 514:8-11). After his employment ended, Olivier Donzé was free to compete with ELS AG, including opening the lab he founded and called Inoxxis SA. (Tr. 846:21-24; 847:12-14).

On September 1, 2009 – shortly after Mr. Donzé's termination by ELS AG – Mr. Donzé, with Dr. Chappuis's assistance, founded a company called Inoxxis SA in Epalinges, Switzerland (later re-named Adipogen SA). (Tr. 545:1-7, 1126:2-8, 1129:23-1130:9). Dr. Chappuis lent Mr. Donzé CHF 50,000 to help Mr. Donzé establish Inoxxis SA. (Tr. 1130:2-9). The same day, Bioaxxess's Board of Directors approved Bioaxxess's acquisition of Inoxxis SA. (PX166 at Andrews_DLAPiper0004087-88). The acquisition of Inoxxis SA by Bioaxxess occurred on December 1, 2009. (Tr. 1129:16-22; PX166). Inoxxis SA was renamed Adipogen SA. (Tr. 1131:6-8). It took over some of the space that had been occupied by Apotech. (PX137).

Before the closure of Apotech, ELS AG placed orders for products made by Apotech through an inter-company order. (Tr. 573:6-574:9; PX203). After the Apotech site was closed, Ms. Dettwiler started ordering products from Inoxxis SA and later Adipogen SA. (Tr. 580:3-6, 584:8-588:3). For example, a purchase invoice from Adipogen SA contains the notation under a purchase of MegaCD40L "specifications according to the email from Silvia." (PX205; Tr. 587:5-21).

## IX.   APPENDIX C

On or about August 20, 2009, Dr. Chappuis entered into Appendix C to the Exclusive Sales and Marketing Agreement between ELS AG and Adipogen. (Tr. 142:6-24; PX133). As an investor and director of Bioaxxess (which controlled Adipogen) and President of ELS AG, Dr. Chappuis sat on both sides of this transaction. (PX133; Tr. 149:1-9). Although Dr. Chappuis had presented Appendix B to ELS for approval, Dr. Chappuis signed Appendix C without informing ELS or seeking its approval as required by ELS AG's internal controls, which stated, "[c]ontracts over CHF 75,000 require legal approval." (Tr. 143:5-13; PX211-12, Appendix A). Additionally, there is no evidence that Dr. Chappuis informed Dr. Balezentis of Appendix C.

Appendix C supplemented and superseded the Exclusive Sales and Marketing Agreement and Appendices A and B, in effect since January 1, 2008. The preamble of Appendix C states:

Major changes (new business parameters) occurred at ALEXIS Corporation (since January 22, 2009 Enzo Life Sciences AG ("ELS AG")) and Apotech Corporation, which include:

a) The sale of ALEXIS Corporation to Enzo Life Sciences, Inc. on June 1, 2007;

b) The acquisition of Biomol International by Enzo Life Sciences, Inc., introducing a panel of products, which compete with AdipoGen, Inc.;

c) The closure of Apotech Corporation and the discontinuation of the CE-labeling project at Apotech Corporation on August 1, 2009.

31

(PX13). Two of the three purported "major changes" – the sale of Alexis to ELS and ELS's acquisition of Biomol – predate January 22, 2009.[12] (Tr. 856:17-857:15, 1144:5-21). Under the terms of Appendix C, ELS AG's exclusive distributions rights to Adipogen products were revoked and, instead, going forward, ELS AG would sell Adipogen products on a non-exclusive basis. (Tr. 145:6-12, 248:12-249:5, 305:18-306:19; PX133 ¶ 4). Appendix C also reduced the Appendix B U.S. list price discount to ELS AG from 60% to 45% and allowed Adipogen to adjust prices at any time upon 60 days' notice. (Tr. 145:13-17, 306:20-307-21; PX133 ¶ 6).

After Appendix C became effective in August 2009, Adipogen charged ELS AG a discount that ranged from 50% of list price in 2009 and 2010 to 45% off list price beginning in 2011 to 30% off list price in 2012, until the ELS AG–Adipogen relationship ended in August 2012. (Tr. 601:8-606:24; PX196). In January 2011, Adipogen lowered its discount to ELS AG but also lowered its selling price. (Tr. 1182:12-14). Had Dr. Chappuis and Ms. Dettwiler followed Appendix B, ELS AG would have purchased from Adipogen at a 60% discount. (PX1 ¶ 1(b); PX15).

Appendix C also relieved Adipogen of its obligation under Appendix B to supply ELS AG the clones and antibodies as well as the know-how that would be used to manufacture the ELISA Kits. (Tr. 145:18-146:4, 307:22-308:6; PX133 ¶ 8). Appendix B allowed Alexis to manufacture and sell selected ELISA kits for CE Labeling. (PX15). The legal ownership of the clones referenced in Appendix B, however, remained with Adipogen, Inc. (PX15).

---

[12] Plaintiff attributes significance to the date of January 22, 2009, but I do not think that is a relevant date. It seems clear to me that the only significance of that date in the paragraph beginning "Major changes" is that it purports to be the date on which Alexis changed its name to ELS AG. That is why the phrase "since January 22, 2009 Enzo Life Sciences AG ("ELS AG")" is entirely enclosed by parentheses. The more relevant date is January 1, 2008, and the only one of the three "major changes" that occurred before that is the sale of Alexis Corporation on June 1, 2007, which is clearly set forth in the recitation. There are transition periods associated with major corporate changes, and there is nothing, in my opinion, facially implausible about reciting an event that occurred seven months before the relevant date as a justification for action occurring well after the relevant date.

32

After Appendix C was executed, the document was kept at ELS AG. (Tr. 963:3-10). When Ms. Dettwiler left ELS AG, she left all her records and papers, including the Adipogen contracts, in the office she shared with Georges Chappuis. (Tr. 1302:5-8). There is no documentary evidence that ELS had knowledge of, authorized, or consented to Appendix C. (Tr. 316:1-3, 332:6-17).

On November 1, 2009, Adipogen and Axxora.com executed a Non-Exclusive Reseller Agreement. (Tr. 863:2-11; PX149). Dr. Youn signed the Non-Exclusive Reseller Agreement on behalf of Adipogen and Brian Conkle, an Axxora officer, signed on behalf of Axxora.com. (Tr. 863:4-11; PX149). The Non-Exclusive Reseller Agreement does not mention Appendix C (PX149); however, Appendix C referenced the Non-Exclusive Reseller Agreement. (PX133). Specifically, Appendix C stated, "Based on the new business parameters, Adipogen, Inc. enters into a new and separate worldwide (excluding Asia) Adipogen brand distribution agreement with Axxora, LLC, a 100% subsidiary of Enzo Life Sciences, Inc." (PX133).

## X. CHAPPUIS CONTACTS ELS AG BUSINESS PARTNERS

During the process of forming Bioaxxess, and after the Individual Defendants became officers, directors, and/or owners of Bioaxxess, Dr. Chappuis contacted other ELS AG customers and partners to discuss Bioaxxess. (Tr. 517:22-519:21, 520:9-21, 523:22-526:24, 532:21-534:24, 536:3-547:24, 1148:1-1149:24; PX53; PX128; PX137; PX158; PX160; PX162). The nature of these contractual relationships, particularly the identity of the vendors and the specific prices at which ELS AG purchased specific products from specific vendors, was not public. (Tr. 515:22-516:6).

### A. Peviva

About December 9, 2008, Dr. Chappuis met with Peter Björklund of Peviva AB ("Peviva"), a Swedish corporation and ELS AG business partner and supplier, to negotiate a

33

potential agreement between Peviva and Bioaxxess. (Tr. 517:19-518:9; PX53). Peviva supplied products to ELS AG for distribution worldwide, including in the United States. (Tr. 516:13-520:21). On March 2, 2009, Dr. Chappuis emailed, from the ELS AG email system, Mr. Björklund with the subject line, "Future Collaboration between Bioaxxess and Peviva AB–CONFIDENTIAL." (Tr. 518:20-519:3; PX53).

Dr. Chappuis further informed Mr. Björklund, "Frank Neumann and I have agreed to establish Bioaxxess (UK) Ltd. internationally in the field of Life Sciences Research Reagents with companies (marketing and sales offices) in UK, USA, Japan, Korea, Switzerland, Germany, France and Italy. The Bioaxxess Group was operational after July 1, 2009. In case of Peviva's interest in a future collaboration with us, we would be glad to provide much more detailed information." (Tr. 519:4-21; PX53).

Bioaxxess UK has no relationship with Bioaxxess, Inc. (Tr. 1213:1-10). At a September 1, 2009 board meeting, Bioaxxess approved acquiring Bioaxxess UK, but the transaction was never consummated. (PX166; Tr. 1210:19-1211:1; 1212:22-1213:10). Dr. Chappuis proposed, "Peviva AB should consider to enter, effective July 1, 2009, into a global marketing and sales agreement with the Bioaxxess Group," which would make Bioaxxess "Peviva AB's preferred partner in marketing and selling Peviva AB's product portfolio internationally," and he sought a "collaboration" with Peviva to launch a new ELISA Kit. (Tr. 520:9-21; PX53). No evidence has been presented that Peviva and any Defendants ever entered into any business relationship or ever actually collaborated. Peviva continued to supply product to ELS AG for sale throughout the period spanning this lawsuit. (Tr. 756:11-21). Nevertheless, "the relationship was dogged by a lack of confidence on [Peviva's] part as to our intent, and it's always [been] a difficult relationship,

34

from the point that [Andrew Whiteley] became responsible for that part of the business." (Tr. 756:7-21).

## B. Robert Gordon University

In July 2009, without the knowledge or consent of ELS, Dr. Chappuis modified a Research & Development Supply Agreement between ELS AG and Robert Gordon University ("RGU"). (Tr. 524:15-526:24; PX211, Appendix A; PX128). Under its original terms, ELS AG committed to fund technical work at RGU to scale to commercial levels the production of several highly specialized natural biochemicals through an annual cash payment and to provide these products to ELS AG. (Tr. 521:6-522:10). In return, ELS AG was granted an exclusive right to distribute "all Compounds produced under this agreement." (*Id.*; PX128). Dr. Chappuis modified the contract such that it granted ELS AG only a "co-exclusive" right to the compounds, indicating that "the other partner is Bioaxxess (UK) Ltd." and that "[i]f they wish [to,] Bioaxxess (UK) Ltd. can also distribute all Compounds." (PX128; Tr. 524:6-526:7). After discovering this change subsequent to Dr. Chappuis leaving ELS AG, ELS contacted RGU, visited RGU two times, and renegotiated the contract to prevent ELS AG from losing its exclusivity. (Tr. 528:16-529:11).

## C. Immutep

On September 3, 2009, Mr. Donzé emailed John Hawken of Immutep, an existing Apotech supplier, and informed him that while ELS had decided to close Apotech, Immutep could continue to do business with Inoxxis. (Tr. 532:21-534:20; PX137). Mr. Donzé's email admitted that Immutep's LAG-3 reagents had not been transferred to ELS. (PX137). Specifically, Mr. Donzé wrote: "Concerning your products, they are still sold by Alexis Biochemicals. Recently, we have founded a new company called Inoxxis SA located in the laboratories of Apotech. We keep your stock of LAG-3 reagents here. I am contacting you to

35

know if you will be available for a meeting with me and Dr. Georges Chappuis (from Alexis) to discuss about a new purchasing agreement between ImmuTep and the new company Inoxxis SA." (PX137; Tr. 533:15-534:21). Mr. Donzé forwarded his exchange with Mr. Hawken to Dr. Chappuis on September 14, 2009. (PX137). The relationship between ELS AG and Immutep was disrupted and had to be re-established. (Tr. 535:11-536:1, 755:5-756:1).

## D. Topotarget

In November and December 2009, while working for ELS AG, Dr. Chappuis and Ms. Dettwiler terminated an ELS AG licensing agreement with Topotarget, a Danish company. (Tr. 536:3-547:24, 1148:1-1149:24; PX158; PX160; PX162). On November 23, 2009, ELS AG Controller Thérèse Morach,[13] who had worked for years with Dr. Chappuis and reported to him and Ms. Dettwiler, emailed Topotarget, copying Ms. Dettwiler, and stated: "We inform you that effective September 30, 2009 Apotech terminates the agreement concerning MegaCD40L between Apotech and Apoxis/Topotarget since the company Apotech Corporation has closed." (Tr. 538:14-539:7; PX158). In response, Topotarget requested a signed notice of termination. (Tr. 539:18-540:3; PX158). Ms. Morach forwarded this response to Ms. Dettwiler, stating: "It's getting difficult now, . . . how should I respond? Who will sign this termination for me?" Ms. Dettwiler, in turn, asked Dr. Chappuis and Mr. Donzé to "please tell us how to proceed here." (Tr. 540:4-541:4; PX158). At the time, November 26, 2009, Mr. Donzé was no longer employed by Apotech or ELS AG and was instead running Inoxxis SA. (Tr. 541:1-3).

On December 6, 2009, Ms. Dettwiler emailed Ms. Morach a draft email to be sent to Topotarget, which stated that ELS AG will send a signed copy of the notice of termination. The email further stated: "Please note that the company Inoxxis S.A. is interested in overtaking the

---

[13] Ms. Morach never worked for, or invested in, Bioaxxess or any of the Adipogen entities. (Tr. 1303:21, 728:17-20).

production and distribution of the MegaCD40L business." (Tr. 541:5-542:2, 543:12-545:7;

PX160).

On December 21, 2009, Dr. Chappuis emailed to Topotarget a letter terminating the ELS

AG–Topotarget contract. (Tr. 545:8-547:7; PX162).

## XI.    CHAPPUIS LEAVES ELS AND ELS AG

On August 9, 2009, Dr. Chappuis emailed Mr. Andrews and Ms. Sales with an "Update,"

stating:

1.    Since a couple of weeks I started to work about 1/3 of my time for
Bioaxxess, Inc.

2.    I fixed (personally and mentally) the date for my resignation from
Enzo Life Sciences for September 28, 2009. This is still highly
confidential.

3.    As you know Tamara is now also very active and we both are
looking forward to the 1st BOD Meeting on September 1,
2009 . . . .

(PX132; Tr. 1128:5-20). In late September 2009, approximately one month after entering into

Appendix C and several months after assuming his position on the Bioaxxess Board of Directors,

Dr. Chappuis advised ELS of his intent to terminate his relationship with ELS. (Tr. 134:23-

141:15; PX140). Dr. Chappuis cited the fact that Alexis had been rebranded as ELS as the

primary reason for his resignation. (Tr. 137:11-138:13).

Specifically, in his resignation letter dated September 21, 2009, Dr. Chappuis stated his

displeasure with the ELS brand that he had been hired to promote: "[B]efore the acquisition the

brand ALEXIS® Biochemicals was a strong brand on the market. Now it is Enzo® Life Sciences.

I take therefore the opportunity to terminate the employment agreement with cause." (PX 140;

Tr. 137:11-138:13). Dr. Chappuis's employment with ELS AG ended on February 28, 2010.

(Tr. 141:12-15, 1152:21-23; PX157).

## XII. DETTWILER LEAVES ELS AG

On July 29, 2010, Ms. Dettwiler resigned and left ELS AG. (Tr. 716:9-11). She terminated her Swiss Employment Agreement with ELS AG for cause. (DX37; PX175). On October 7, 2010, Ms. Dettwiler and ELS AG executed an Agreement Regarding Dissolution of Employment Relationship. (Tr. 716:11-16; DX37). The Dissolution of Employment Relationship includes a release that stated, "Upon fulfillment of the aforementioned obligations, the parties shall be satisfied in full and final settlement of all claims arising from the employment agreement, so that neither party may claim anything more from the other party." (PX175; DX37). By letter dated October 6, 2011, ELS AG rescinded the Agreement Regarding Dissolution of Employment Relationship, citing Article 24 Section 1 Clause 4 and Article 28 Section 1 of the Swiss Code of Obligations. (Tr. 717:4-16, 913:19-915:8; PX209).

## XIII. ELS'S INVESTIGATION

Andrew Whiteley consulted for ELS for many months prior to June 1, 2008. (Tr. 276:6-11). Mr. Whiteley then became Chief Operating Officer of ELS. (Tr. 276:6). In October 2010, Mr. Whiteley, by then also acting President of ELS, received information from ELS AG that led him to start an internal investigation. (Tr. 293:21-297:16).

First, a phone call was received at ELS AG's offices from a local hotel requesting payment for a guest whom the hotel believed was visiting ELS AG. (Tr. 295:3-296:3). The guest was a consultant of ELS AG, but ELS AG did not know of his visit, and it turned out that he was in fact a guest of Adipogen SA. (*Id*). Second, ELS AG received a product sample from a vendor that was addressed to an Adipogen entity. (Tr. 296:4-17). Third, ELS AG discovered through public records that Adipogen SA, formerly Inoxxis SA, had been incorporated in Switzerland in May 2010, and that Ms. Sales, Mr. Traina, and Mr. Donzé were listed as the company's managers. (Tr. 296:19-301:12; PX178A).

Mr. Whiteley asked the new head of ELS AG, Walter Isler, to send him the Adipogen contracts. Mr. Isler located a paper copy of Appendix C in ELS AG's stored hard copy files. (Tr. 297:13-298:2, 302:15-23; PX178A). Mr. Whiteley and others at ELS were "shocked" by Appendix C's terms, which they considered disadvantageous to ELS AG. (Tr. 144:2-145:5, 305:9-17).

To assist in his investigation, Mr. Whiteley obtained access to Dr. Chappuis's ELS AG email. (Tr. 317:1-18). Mr. Whiteley discovered that, before Dr. Chappuis left his employment, he had deleted his entire email box with the exception of a handful of inconsequential emails. (Tr. 317:19-318:4, 710:5-711:8, 1152:24-1153:5; PX191). Dr. Chappuis testified that he deleted all his emails upon leaving ELS AG to protect his privacy, as he had many personal emails and his computer at ELS AG was his only computer. (Tr. 1157:1-5). Mr. Whiteley instructed ELS's and ELS AG's information technology staff to restore Dr. Chappuis's email box from back-up tapes. (Tr. 318:10-23; PX192). Dr. Chappuis's email box was restored and Mr. Whiteley reviewed its contents. Mr. Whiteley also reviewed other ELS AG employees' email boxes (including Ms. Dettwiler's and Ms. Morach's), discovering the emails and other documents discussed above. (Tr. 330:12-23; PX192).

## ANALYSIS

Plaintiff brought twelve counts against Defendants:

I.   Breach of Contract against Dr. Chappuis, Ms. Sales, and Ms. Dettwiler

II.  Fraudulent Inducement against Dr. Chappuis

III. Breach of Fiduciary Duty against Dr. Chappuis

IV.  Breach of Fiduciary Duty against Ms. Sales

V.   Aiding and Abetting Breach of Fiduciary Duty against Ms. Dettwiler, Adipogen Corp., Adipogen International, and Bioaxxess

39

VI.     Misappropriation of Trade Secrets against All Defendants

VII.    Conversion against All Defendants

VIII.   Unfair Competition against All Defendants

IX.     Tortious Interference with Contract against All Defendants

X.      Tortious Interference with Business Relations against All Defendants

XI.     Unjust Enrichment against All Defendants

XII.    Civil Conspiracy against All Defendants

The Court's jurisdiction is based on diversity. The Stock Purchase Agreement provides

for venue in Delaware. (PX5 at ¶ 10.11). The Court will take these counts in turn.

## Choice of Law Legal Standard

"A federal court, sitting in diversity, follows the forum's choice of law rules. . . ." *Ross*

*v. Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985). "Delaware courts look to the

Restatement (Second) of Conflict of Laws for guidance in choice of law disputes." *Gloucester*

*Holding Corp. v. U.S. Tape & Sticky Products, LLC*, 832 A.2d 116, 124 (Del. Ch. 2003).

## Count I:  Breach of Contract

### *Choice of Law*

The Delaware Supreme Court has determined that for contract claims, the Court must

consider several factors in determining which forum's law to apply, including "the place of

contracting, the place of negotiation, the place of performance, the location of the subject matter

of the contract, and the domicile, residence, nationality, place of incorporation and place of

business of the parties." *In re Am. LaFrance, LLC*, 461 B.R. 267, 272 (Bankr. D. Del. 2011).

Furthermore, "[u]nder Delaware law, express choice of law provisions in contracts are generally

given effect." *Weiss v. Nw. Broad. Inc.*, 140 F. Supp. 2d 336, 342 (D. Del. 2001). Here, the

40

Stock Purchase Agreement states that it is governed by Delaware law. (PX 5 ¶ 10.8). The Stock Purchase Agreement further states that the "non-competition provisions of the Purchase Agreement and employment agreements may only be enforced to the extent they comply with applicable California law." (*Id.* at Schedule 2.1(d)). The Court sees no reason to disturb the parties' choice of law and will thus apply Delaware law. If there were an argument about whether the non-competition clause is enforceable, the Court would apply California law. Neither Plaintiff nor Defendants contend that the Stock Purchase Agreement's non-competition clause is invalid or unenforceable under either Delaware or California law. (D.I. 183 at 15; D.I. 185 at 18). Therefore, the Court finds that the non-compete clauses are enforceable.

*Analysis*

Plaintiff contends that the Individual Defendants breached the Stock Purchase Agreement's non-compete clause, non-solicitation clause, and confidentiality clause. (D.I. 183 at 17-18). The Individual Defendants argue that (1) they did not directly compete with ELS, (2) nothing in the Stock Purchase Agreement prohibited the Individual Defendants from preparing to compete with ELS, (3) nothing in the Stock Purchase Agreement prohibited the Individual Defendants from financing a company that might compete with ELS in the future, (4) any alleged solicitation occurred after the two-year Stock Purchase Agreement restriction expired, and (5) ELS waived its right to assert a breach of the Stock Purchase Agreement. (D.I. 185 at 21-26). The Court finds that Plaintiff proved by a preponderance of the evidence that the Individual Defendants violated the Stock Purchase Agreement.

The Stock Purchase Agreement's non-compete clause prohibited the Individual Defendants from competing with any "Acquired Company." (PX5 ¶ 5.17(a)). The Stock Purchase Agreement defines "Acquired Company" as Axxora and its subsidiaries. (PX5 Art. IX,

41

ADIPOGEN-0005339-40, ADIPOGEN-0005283). The non-compete clause was valid for a period of two years from the closing date. The closing date was May 31, 2007. Thus, the non-compete clause was in effect until May 31, 2009. Bioaxxess acquired a majority stake in Adipogen on March 31, 2009, two months before the non-competition period expired. Thus, each of the Individual Defendants had a financial interest in Adipogen prior to the expiration of his or her non-competition period. Plaintiff argues that the Individual Defendants breached the non-compete clause because Adipogen competed directly with Biomol and Assay Designs, two wholly owned ELS subsidiaries. (D.I. 183 at 17). However, Biomol and Assay Designs were not Acquired Companies as defined in the Stock Purchase Agreement.[14] Therefore, Plaintiff has not shown that the Individual Defendants competed with any Acquired Company. Plaintiff has therefore not proven by a preponderance of the evidence that the Individual Defendants violated the non-compete clause.[15]

Plaintiff further asserts that the Individual Defendants breached the Stock Purchase Agreement's non-solicitation clause. (D.I. 183 at 18). The non-solicitation clause prohibited the Individual Defendants from interfering with any Acquired Company's relationship with any "client, customer, supplier, manufacturer, distributor, consultant, licensor, licensee, or other Person." (PX5 ¶ 5.17(b)). Adipogen was a supplier of Alexis/ELS AG, an Acquired Company. By acquiring a majority stake in Adipogen two months before the non-solicitation period expired, the Individual Defendants interfered with the Adipogen–ELS AG relationship.

---

[14] I do not read the language that follows "Acquired Company" in the Stock Purchase Agreement (PX5 ¶ 5.17(a)) as expanding the scope of the non-compete clause to include activities that are not the business of the Acquired Companies.
[15] Because the Court finds that the Individual Defendants did not compete with any Acquired Company, the Court need not, and will not, address whether the Stock Purchase Agreement prohibited preparations to compete.

Therefore, the Court finds that Plaintiff has proven by a preponderance of the evidence that the Individual Defendants breached the non-solicitation clause of the Stock Purchase Agreement.

The Individual Defendants maintain that ELS waived its right to assert a breach of the Stock Purchase Agreement with respect to Adipogen because Dr. Balezentis was aware that Dr. Chappuis was continuing to seek a long-term financing option for Adipogen. (D.I. 185 at 26-27). The Court disagrees. The Court finds that while there is evidence that Dr. Balezentis stated, "do what you feel you have to do" to "save" Adipogen (Tr. 938:23-939:5, 952:21-953:15; 1319:21-1324:16), this is insufficient evidence that an oral modification of the Stock Purchase Agreement occurred.[16] The Stock Purchase Agreement makes clear that any amendments or waivers of any provision of the Agreement are invalid unless in writing and signed by the Buyer, the Company, and the Security Holder's Representatives. (PX 5 at ¶ 10.9). An oral statement by Dr. Balezentis clearly does not satisfy this requirement.

Plaintiff also argues that the Individual Defendants breached the confidentiality clause of the Stock Purchase Agreement. (D.I. 183 at 18-19). The confidentiality clause precludes the Individual Defendants from disclosing the Acquired Companies' "Confidential Information," defined in the Agreement to include customer lists and business plans that were treated as confidential. (PX5 ¶ 5.17(c), Art. IX). Plaintiff argues that Dr. Chappuis emailed business plans, customer lists, and other internal documents to Ms. Sales and other Bioaxxess investors. (D.I. 183 at 18-19). The Court agrees that the "Strategic Operations Meeting Documents" and the Apotech documents are confidential information "concerning [an] Acquired Company." In addition, Dr. Chappuis used confidential Acquired Company information for his own account when reaching out to Peviva, Robert Gordon University, Immutep, and Topotarget. The Court is

---

[16] It also seems that Dr. Chappuis deliberately kept from ELS all relevant details about his efforts in regard to Adipogen.

not persuaded that the Apotech plant closure involved the misuse of confidential information. The Court therefore finds that Plaintiff has proven by a preponderance of the evidence that Dr. Chappuis breached the confidentiality clause of the Stock Purchase Agreement. Plaintiff has not presented evidence that the other Individual Defendants breached the confidentiality clause.

## Count II: Fraudulent Inducement against Dr. Chappuis

The Court granted Judgment as a Matter of Law against Plaintiff for Count II. (Tr. 918).

## Count III: Breach of Fiduciary Duty against Dr. Chappuis

### *Choice of Law*

"In deciding disputes between and among corporate actors, Delaware subscribes to the internal affairs doctrine, a conflict of laws principle under which the internal affairs of a corporate entity are governed by the laws of the state of incorporation. . . . Claims implicating an entity's internal affairs include breach of fiduciary duty, aiding and abetting, and waste." *Xcell Energy & Coal Co., LLC v. Energy Inv. Grp., LLC*, 2014 WL 2964076 at \*3 (Del. Ch. June 30, 2014) (footnotes omitted). As ELS is incorporated in New York, and ELS is accusing Dr. Chappuis in his capacity as Head of Global Marketing of ELS, Delaware choice of law doctrine dictates that this Court apply New York law to the breach of fiduciary duty claim. Defendants argue that Swiss law applies, as Dr. Chappuis is the director of ELS AG and ELS AG is incorporated in Switzerland. (D.I. 185 at 19). While the Court agrees that Dr. Chappuis was a director of ELS AG, the case was brought by ELS, not ELS AG. If this case were brought by ELS AG, Delaware choice of law would dictate that this Court should apply Swiss law. As ELS, a New York corporation, brought this case, the Court must apply New York law.[17]

### *Analysis*

---

[17] Defendants state: "Swiss law applies but does not appear to conflict with New York or Delaware law, except on the issue of damages that must be demonstrated through the theory of balance." (D.I. 185 at 27).

44

Plaintiff alleges that Dr. Chappuis breached his fiduciary duty by investing in Bioaxxess, sitting on its board of directors, and effectively running Bioaxxess when it acquired control over Adipogen. (D.I. 183 at 20). Plaintiff also argues that Dr. Chappuis solicited ELS AG's employees and used ELS AG offices to set up Bioaxxess. (*Id.* at 21). Furthermore, Plaintiff argues that, while sitting on both sides of the transaction, Dr. Chappuis modified Adipogen's contract with ELS AG. (*Id.* at 20). Finally, Plaintiff argues that Dr. Chappuis breached his fiduciary duty by misappropriating ELS products during the Apotech site closure. (*Id.* at 21). Defendants argue that Plaintiff's position "that any outside investments or business dealings undertaken by a director or officer entail a breach of fiduciary duty is not supported by the law of New York, Delaware, or Switzerland." (D.I. 185 at 28). Furthermore, Defendants argue that, even if the outside business dealings involve competition with the company to which he owes a fiduciary duty, this does not in and of itself give rise to recoverable damages. (*Id.*). Finally, Defendants maintain that ELS is now "seek[ing] to recast its claims under the law of agency, arguing that it has made out a claim for violation of an employee's duty of loyalty to his or her employer or arising from an agent's conflict of interest with his principal." (*Id.* at 29 (internal quotation marks and brackets omitted)).

Under New York law, to prove that there was a breach of fiduciary duty, Plaintiff must prove "[(1)] breach by a fiduciary of a duty owed to plaintiff; [(2)] defendant's knowing participation in the breach, and [(3)] damages." *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004). "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." *WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001) (internal citations omitted).

45

Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

*Penato v. George*, 383 N.Y.S.2d 900, 904-05 (N.Y. App. Div. 1976) (internal citations omitted).

The Court finds that Dr. Chappuis had a fiduciary relationship with ELS. Two main facts support this conclusion. First, Dr. Chappuis was the Head of Global Marketing for ELS. Second, Dr. Chappuis's own testimony indicated that he was in constant contact with Dr. Balezentis, the CEO of ELS. Dr. Chappuis testified that he both reported directly to Dr. Balezentis and provided him with advice, especially as it concerned Adipogen. Dr. Chappuis's own testimony proves that a "relationship exist[ed] . . . in which confidence ha[d] been reposed. . . ." *Id.* at 904.

All but one of Plaintiff's liability theories address the fiduciary duty Dr. Chappuis owed to ELS AG, not to ELS. As President of ELS AG, Dr. Chappuis owed it a separate fiduciary duty. Using ELS AG offices to set up Bioaxxess, sitting on both sides of the Adipogen–ELS AG transaction, and investing in Bioaxxess may constitute a breach of fiduciary duty to ELS AG. However, ELS AG is not a party to this suit. Under New York law, "a corporation usually does not have standing to enforce the rights of its subsidiaries." *Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*, 2010 WL 4739938, at \*9 (S.D.N.Y. Nov. 5, 2010) (collecting cases). A narrow exception has been carved out of that general rule, but it is not applicable here. Where a defendant owes a fiduciary duty to both a parent company and its subsidiary, the parent has standing to sue for a breach of fiduciary duty to the subsidiary if it can prove that the breach caused the value of the parent corporation's own shares to decline. *Qantel Corp. v. Niemuller*,

46

771 F. Supp. 1361, 1367 (S.D.N.Y. 1991). No such showing has been made in this case, and the general rule that a parent may not sue for breach of fiduciary duty to its subsidiary applies.

The only conduct Plaintiff identifies that could implicate Dr. Chappuis's duty to ELS is the allegation that Dr. Chappuis misappropriated ELS products during the Apotech site closure. As discussed below, this Court finds that Plaintiff did not prove that it had a property interest in the Apotech products by a preponderance of the evidence. Therefore, misappropriation cannot serve as a basis for a breach of fiduciary duty to ELS.

Furthermore, even if Plaintiff could show a breach of fiduciary duty, it must also prove that damages flowed from the breach. Plaintiff has failed to make such a showing. Plaintiff is ELS, not ELS AG. ELS AG has a separate corporate existence. Plaintiff only presented evidence of damages to ELS AG. Plaintiff presented no evidence as to how any damages to ELS AG flow to ELS. ELS cannot recover for damages suffered by ELS AG any more so than it could be sued for damages because of tortious acts undertaken by ELS AG. Therefore, as Plaintiff has failed to provide any evidence regarding the damages element, Plaintiff cannot prove a breach of fiduciary duty. Thus, the Court finds that Plaintiff has not proven Count III by a preponderance of the evidence.

## Count IV: Breach of Fiduciary Duty against Ms. Sales

### *Choice of Law*

For the reasons stated in the prior section, the Court applies New York law to Count IV.

### *Analysis*

Plaintiff has failed to prove that Ms. Sales had a fiduciary relationship with ELS. While Ms. Sales may have a fiduciary relationship with Axxora, Plaintiff alleges that she breached a fiduciary duty to ELS, not Axxora. Ms. Sales was not an officer of ELS. There is no evidence in

the record that Ms. Sales was even an employee of ELS. Unlike Dr. Chappuis, she did not

advise Dr. Balezentis. Therefore, Plaintiff has not made a sufficient showing that a relationship

of trust existed between Ms. Sales and ELS.

Furthermore, even if a fiduciary relationship existed, Plaintiff failed to present evidence as

to how damages to ELS AG flow to ELS, just as it failed in Count III against Dr. Chappuis. Thus,

Plaintiff has failed to prove Count IV by a preponderance of the evidence.

## Count V: Aiding and Abetting Breach of Fiduciary Duty against Ms. Dettwiler, Adipogen Corp., Adipogen International, and Bioaxxess

### Choice of Law

For the reasons discussed above for Count III, the Court applies New York law to Count

V.

### Analysis

"Under New York law, a tortious interference with fiduciary duty claim consists of three

elements: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly

induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the

breach." *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 (2d Cir. 1998) (internal quotation marks

and footnotes omitted). The Court found that Plaintiff did not prove its breach of fiduciary duty

claims against Dr. Chappuis and Ms. Sales. Plaintiff cannot make out the first element of aiding

and abetting breach of fiduciary duty against Ms. Sales, and cannot make out the third element

against both Dr. Chappuis and Ms. Sales. Thus, Plaintiff cannot prove any aiding and abetting a

breach of fiduciary duty because it cannot prove any breach of fiduciary duty. The Court finds

that Plaintiff failed to prove Count V by a preponderance of the evidence.

## Count VI: Misappropriation of Trade Secrets against All Defendants

### Choice of Law

48

In a tort action, the Court considers four specific contacts in applying these broad policy considerations to the choice of law determination: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*UbiquiTel Inc. v. Sprint Corp.,* 2005 WL 3533697 at \*3 (Del. Ch. Dec. 14, 2005) (internal footnotes and quotations marks omitted). "When evaluating these factors, a court must not simply add up the interests on both sides of the equation and automatically apply the law of the jurisdiction meeting the highest number of contacts listed in [Restatement (Second) of Conflicts] Section 145. Instead, a court is to evaluate the contacts in accordance with their relative importance to the particular issue." *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003) (internal citations and quotation marks omitted). Plaintiff argues that New York law should apply (D.I. 183 at 14), and Defendants argue that Swiss law should apply. (D.I. 185 at 20).

First, as ELS is incorporated in New York, the injury occurred in New York. The first factor therefore favors applying New York law. Second, the place where the conduct occurred is different for each Defendant. For Dr. Chappuis, the conduct occurred mostly in Switzerland; for Ms. Sales, the conduct occurred in California; and for Ms. Dettwiler, the conduct occurred in Switzerland. For the Corporate Defendants, the conduct occurred mostly in Switzerland. Third, the physical locations of the various parties range from California to New York to Switzerland. Therefore, the Court finds that the second and third factors do not favor any place in particular. Fourth, the parties' relationship centered in New York, as the claims derive from Defendants' interactions with ELS, a New York corporation. Weighing these factors, the Court finds that New York law applies to Count VI.

49

*Analysis*

There is no generally accepted definition of a trade secret but that found in section 757 of Restatement of Torts, comment b has been cited with approval by this and other courts. It defines a trade secret as any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. The Restatement suggests that in deciding a trade secret claim several factors should be considered: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1012-13 (N.Y. 1993) (internal quotation marks,

alterations in original, and citations omitted).

Plaintiff presented no evidence concerning any of the aforementioned six factors.

Therefore, since Plaintiff failed to show that the claimed documents are, or contain, trade secrets,

Plaintiff is unable to prove misappropriation of trade secrets by any Defendants. Simply

marking documents confidential, or asking persons not to distribute the documents, does not

satisfy any of the six factors. Thus, the Court finds that Plaintiff has failed to prove Count VI by

a preponderance of the evidence.

## Count VII: Conversion against All Defendants

*Choice of Law*

Both parties agree that Swiss law applies to Count VII. (D.I. 183 at 14; D.I. 185 at 20).

The Court agrees, as the conduct that ELS attributes to the conversion claim occurred

exclusively in Switzerland.[18]

*Analysis*

---

[18] No party argues that the Court is exceeding its authority in deciding whether Swiss citizens violated Swiss law by actions taken solely in Switzerland.

The extent of Plaintiff's argument concerning conversion is a single sentence: "Chappuis and Dettwiler willfully misappropriated ELS products during the Apotech closure, which is actionable in tort under both Swiss and U.S. law." (D.I. 183 at 30 (internal citations omitted)). This single, conclusory argument is not sufficient to prove by a preponderance of the evidence that any of the allegedly converted materials were actually converted. Furthermore, even if this single sentence were sufficient, Plaintiff failed to show that ELS had a property interest in any of the allegedly converted materials. Certain products were not transferred to ELS's subsidiaries after the Apotech site closure. Some of those products were on consignment and ELS clearly did not own them. It appears as though there were other products owned by ELS subsidiaries that were not transferred, but there is a failure of proof that ELS owned those products at the time of any diversion. Thus, Plaintiff has not proven Count VII by a preponderance of the evidence and the Court finds for Defendants.

## Count VIII: Unfair Competition against All Defendants

### *Choice of Law*

The same four factors that the Court considered for Count VI, misappropriation of trade secrets, apply to the determination of which law the Court should apply to Count VIII. For the reasons discussed above, the Court finds that Count VIII should also be governed by New York law.

### *Analysis*

To prevail on an unfair competition claim under New York law, a plaintiff must "show that the defendant has misappropriated the labors and expenditures of another." *Talk To Me Products, Inc. v. Larami Corp.*, 992 F.2d 469, 470 (2d Cir. 1993) (internal quotation marks omitted). "An unfair competition claim involving misappropriation usually concerns the taking

51

and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982).

Plaintiff argues that the Individual Defendants and Bioaxxess engaged in unfair competition. Plaintiff argues that (1) Dr. Chappuis and Ms. Dettwiler "misappropriated Apotech materials for the illicit benefit of themselves and the Corporate Defendants" and (2) "[t]he Individual Defendants and Bioaxxess . . . misappropriated ELS confidential information and trade secrets so that they could build their own business. . . ." (D.I. 183 at 34).

First, as the Court previously found, Plaintiff has not shown by a preponderance of the evidence that Dr. Chappuis or Ms. Dettwiler misappropriated any ELS property by any diversion of Apotech materials. Second, Plaintiff has failed to prove the existence of any trade secrets, and thus has also failed to prove that any trade secrets were misappropriated. Third, and finally, Plaintiff has not met its burden to show that any confidential information was both misappropriated and used to compete against ELS. While Plaintiff has proven that several confidential emails were sent to officers of Bioaxxess, Plaintiff has provided no evidence that any of this information was actually used. Therefore, Plaintiff has failed to meet its burden and the Court finds in favor of Defendants as to Count VIII.

Count IX: Tortious Interference with Contract against All Defendants

*Choice of Law*

The same four factors that the Court considered for Count VI, misappropriation of trade secrets, apply to the determination of which law the Court should apply to Count IX. For the reasons discussed above for Count VI, Court finds that Count IX should be governed by New York law.

52

*Analysis*

Plaintiff argues that Dr. Chappuis and Bioaxxess tortiously interfered with the Adipogen contract (D.I. 183 at 27) and that Dr. Chappuis and Ms. Dettwiler tortiously interfered with the Topotarget contract (*id.* at 29). Defendants argue that there was no tortious interference. (D.I. 185 at 39). To prove tortious interference, Plaintiff must show "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996). The Court will address the contracts with Adipogen and Topotarget in turn.

Plaintiff did prove that there was a contract between ELS AG and Adipogen. (Appendix B, PX 15). Plaintiff also proved that Dr. Chappuis and Bioaxxess knew of this contract. Plaintiff did not prove that it was a party to that contract. Thus, it proved no damages to ELS. Further, Plaintiff did not prove that Adipogen breached the contract by forming a new contract. (Appendix C, PX 133). While it is certainly true that Dr. Chappuis sat on both sides of the table during the writing of Appendix C, Plaintiff fails to point to any "procurement of the third-party's [*i.e.*, Adipogen's] breach of the contract without justification." Therefore, Plaintiff has failed to prove that either Dr. Chappuis or Bioaxxess tortiously interfered with the Adipogen contract.

Turning to the Topotarget contract, Plaintiff again fails to provide evidence of an actual breach of the contract. While Plaintiff does note that Dr. Chappuis emailed Topotarget a letter terminating the ELS AG–Topotarget contract, this action does not in and of itself constitute a breach of contract by Topotarget, which was an independent third party. Furthermore, Plaintiff

has again not shown it was a party to the contract. Therefore, Plaintiff has failed to meet its burden, and the Court finds in favor of Defendants as to Count IX.

## Count X: Tortious Interference with Business Relations against All Defendants

### *Choice of Law*

The same four factors that the Court considered for Count VI, misappropriation of trade secrets, apply to the determination of which law the Court should apply to Count X. For the reasons discussed above, as per Count VI, Count X should be governed by New York law.

### *Analysis*

Plaintiff argues that Dr. Chappuis and Bioaxxess tortiously interfered with ELS's business relations with Peviva, Robert Gordon University, and Immutep. (D.I. 183 at 29). "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (N.Y. 2004). To prove tortious interference, Plaintiff must prove that "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, 2014 WL 3610906 at \*11 (S.D.N.Y. July 21, 2014) (citing *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002)). "[A] plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with a continuing business or other customary relationship not amounting to a formal contract." *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (internal quotation marks omitted). Furthermore, Plaintiff must prove that the interference was conducted using "wrongful means." *Id.* at 206. Under New York law, "wrongful means"

54

includes "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (N.Y. 1980). Without more, it is not enough that the defendant's interference is solely intended to advance his own competing interests. *Hannex Corp.*, 140 F.3d at 206. Finally, "[a] knowing breach of fiduciary duty may . . . amount to a fraud or misrepresentation." *Id.*

Plaintiff failed to prove by a preponderance of the evidence that Dr. Chappuis and Bioaxxess tortiously interfered with ELS's business relations. First, Plaintiff failed to prove that it had business relations with Peviva, Robert Gordon University, and Immutep. Rather, Plaintiff demonstrated that ELS AG had business relations with Peviva, Robert Gordon University, and Immutep. Not having shown the first element, the second and third elements cannot be met. Moreover, even if Plaintiff had shown the first three elements, it failed to prove that Dr. Chappuis's acts injured ELS AG's relationships with Peviva, Robert Gordon University, or Immutep. For each of the aforementioned companies, Plaintiff's proof only adduced that the various relationships were disrupted and had to be reestablished. This is not sufficient to show that the business relationships were injured. No damages have been shown. Therefore, Plaintiff has failed to meet its burden and the Court finds in favor of Defendants as to Count X.

Count XI: Unjust Enrichment against All Defendants

The parties disagree as to whether New York or Delaware law applies to Plaintiff's unjust enrichment claim. (D.I. 183 at 4-5; D.I. 185 at 11). However, this dispute is inconsequential. Under either law, a prerequisite of finding unjust enrichment is that a party was in fact unjustly enriched. *See Installed Bldg. Products, LLC v. Cottrell*, 2014 WL 3729369 at *11 (W.D.N.Y.

July 25, 2014) (detailing the requirements for unjust enrichment under New York law); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (detailing the requirements for unjust enrichment under Delaware law). Plaintiff argues that Defendants were unjustly enriched because they misappropriated products from Apotech and did not transfer the ELISA kit technology. (D.I. 183 at 30). As discussed above, Plaintiff has not proven that any products belonging to Plaintiff were misappropriated by any Defendants.[19] Additionally, while Appendix B included a provision that would require the transfer of the ELISA kit technology under certain circumstances, Plaintiff failed to prove that the conditions detailed in Appendix B for the technology to be transferred were ever fulfilled. Thus, Plaintiff has not proven by a preponderance of the evidence that the ELISA kit technology was misappropriated. Therefore, Plaintiff has failed to meet its burden and the Court finds in favor of Defendants as to Count XI.

Count XII: Civil Conspiracy against All Defendants

*Choice of Law*

The same four factors that the Court considered for Count VI, misappropriation of trade secrets, apply to the determination of which law the Court should apply to Count XII. For the reasons discussed above for Count VI, the Court finds that Count XII should also be governed by New York law.

*Analysis*

New York does not recognize an independent cause of action for conspiracy to commit a civil tort. *Romano v. Romano*, 767 N.Y.S.2d 841 (N.Y. App. Div. 2003). "Therefore, under New York Law, to establish a claim of civil conspiracy, the plaintiff must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2)

---

[19] To the extent Defendants misappropriated any Apotech products, it appears that ELS AG could have sought a remedy against them in Switzerland.

56

an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (N.Y. App. Div. 2010) (internal quotation marks omitted). Here, Plaintiff has failed to prove any underlying tort. Therefore, there can be no civil conspiracy. Thus, Plaintiff has failed to meet its burden and the Court finds in favor of Defendants as to Count XII.

## Damages

Plaintiff requests (1) "out-of-pocket" damages, (2) lost future profits, (3) forfeiture of money paid to the Individual Defendants under the Stock Purchase Agreement, (4) the return of misappropriated materials and confidential information, (5) punitive damages, (6) pre- and post-judgment interest, and (7) attorney's fees. (D.I. 183 at 39-48). The Court will address these requests in turn.

### *Out-of-Pocket Damages*

Plaintiff requests out-of-pocket damages, which arise under five different theories. (D.I. 183 at 39-42). They are: (1) $508,812.55, which is the amount ELS AG paid to Inoxxis SA or Adipogen for products that were misappropriated from Apotech; (2) $35,841, which represents lost revenue from the sale of Flagellin, a product consigned to Apotech which found its way to Adipogen, reducing the profits to ELS AG; (3) $413,781, which represents increased costs to ELS AG of purchases from Adipogen over the prices agreed to in Appendix B; (4) $150,000, which is the payment ELS AG made to Adipogen in connection with Appendix B; and (5) $682,400, which represents the research and development costs that ELS spent to "redevelop misappropriated products." (*Id.*).

Given the Court's liability findings, most of the theories for recovering the claimed out-of-pocket costs are not viable. In addition, amounts ELS AG overpaid due to the misfeasance of any Defendants are not recoverable by Plaintiff. Plaintiff can only recover damages it has proved it suffered. The first four theories of out-of-pocket damages all suffer from this same deficiency. That is, any damages Plaintiff demonstrated were suffered by ELS AG, not ELS. Moreover, Plaintiff did not demonstrate an ownership interest in the "misappropriated products." Therefore, any costs of "redeveloping" them do not represent an injury to Plaintiff. Therefore ELS has proved no out-of-pocket damages.

*Loss of Future Profits*

Plaintiff argues that it is should be awarded lost profits in the amount of $7,836,767. (D.I. 183 at 42). Plaintiff argues that lost profits would be the combination of the future margin on Adipogen product sales ($5,921,346) and ELISA Kit sales ($1,915,421). (*Id.*). The Court finds that Plaintiff has not proved by a preponderance of the evidence that Plaintiff should be awarded any lost profits in connection with the breach of contract. In addition, Plaintiff's lost profits estimate is based on the assumption that Adipogen would not go out of business and could thus continue to supply products. Adipogen was suffering severe financial difficulties, and it was a very real possibility that it would not have survived. Plaintiff's estimate is therefore based on a premise that is contrary to the weight of the evidence presented at trial. Moreover, any profit that might have been lost would have been suffered by ELS AG, not ELS.

*Forfeiture of Money Paid to the Individual Defendants under the Stock Purchase Agreement*

Plaintiff argues that, as an alternative to lost profits, the Court should order the Individual Defendants to forfeit the money paid to them under the Stock Purchase Agreement. (D.I. 183 at 46). Plaintiff bases this argument on New York's faithless servant doctrine, which provides that

58

a disloyal employee may be required to forfeit compensation paid to him during the period of disloyalty, even if the employer suffered no damages.[20] *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003). First, as discussed above, the Stock Purchase Agreement is governed by Delaware law. Delaware has not adopted the faithless servant doctrine. Even if Delaware did recognize the doctrine, it is not applicable to this situation. The money paid under the Stock Purchase Agreement was not compensation for employment. ELS paid to purchase Axxora and its subsidiaries. Each of the Individual Defendants entered into separate employment agreements.[21] Therefore, the faithless servant doctrine cannot serve as a ground to forfeit the payment made under the Stock Purchase Agreement.

### *Return of Misappropriated Materials and Confidential Information*

Plaintiff did not prove that any of its materials were misappropriated. Therefore, there can be no materials to return. In addition, it is not feasible to order the return of documents that were forwarded electronically over five years ago.

### *Punitive Damages*

Plaintiff seeks punitive damages under New York law for each of its tort claims. (D.I. 183 at 48). As the Court finds that Plaintiff failed to prove any of those claims by a preponderance of the evidence, punitive damages are not appropriate. Plaintiff also seeks punitive damages for breach of the Stock Purchase Agreement. (*Id.*). Because the Court finds that the Individual Defendants breached the Agreement, I will address punitive damages for the breach of contract.

---

[20] Plaintiff also notes that the law recognizes reliance and restitution damages (D.I. 183 at 46), but offers no argument as to how or why those measures of damages would entitle the Plaintiff to the money paid to the Individual Defendants under the Stock Purchase Agreement.

[21] ELS could not sue Dr. Chappuis or Ms. Dettwiler in this Court for breach of their employment agreements because their agreements provided for "[e]xclusive jurisdiction i[n] Liestal / [Canton of Basel-Landschaft]." (PTX 6 at 8; PTX 7 at 8). ELS could not sue Ms. Sales in this Court for breach of her employment agreement because her agreement contained an arbitration clause and a New York forum selection clause. (PTX 8 at 9).

Under Delaware law, "punitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort." *Bhole, Inc. v. Shore Investments, Inc.*, 67 A.3d 444, 454 (Del. 2013). Punitive damages for breach of contract are appropriate only when the defendant breached the contract "maliciously and without probable cause, for the purpose of injuring the other party by depriving him of the benefits of the contract." *Reiver v. Murdoch & Walsh, P.A.*, 625 F. Supp. 998, 1015 (D. Del. 1985) (internal quotation marks and alterations omitted). Dr. Chappuis testified at trial that he believed he fully complied with the terms of the Stock Purchase Agreement. (Tr. 1012:9-16). The Court found his testimony generally credible. Dr. Chappuis clearly performed, for a time, under his various contracts, and continued to do so when he tried to get ELS to invest in Adipogen. There was a carve out in his employment agreement for his consultancy with Adipogen. He clearly exceeded that carve out as the non-compete/non-solicitation period ran on, but the Court cannot find that Plaintiff has proved that he acted maliciously for the purpose of injuring ELS. There was no evidence from which the Court could find that Ms. Dettwiler or Ms. Sales acted with the malice required for punitive damages. Therefore, the Court will not award punitive damages.

### *Nominal Damages*

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages." *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, No. 3158, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009). Nominal damages are not a measure of damages suffered by a party, "but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong." *Id.* The Court finds that the

60

Individual Defendants breached the non-solicitation clause of the Stock Purchase Agreement and that Dr. Chappuis breached the confidentiality clause. However, Plaintiff was not able to establish that it suffered any damage as a result of the breach. The Court therefore grants nominal damages in the amount of one dollar against each of Ms. Sales and Ms. Dettwiler, and ten dollars against Dr. Chappuis. The Court grants a greater amount against Dr. Chappuis because it is clear that he had the dominant role, relative to Ms. Sales and Ms. Dettwiler, in all the activities at issue in the case.

### Pre- and Post-Judgment Interest

Delaware law governs the determination of pre- and post-judgment interest as the breach of contract was governed by Delaware law. "Under Delaware law, a party is entitled to prejudgment interest when the amount of damage is calculable, and such interest has been awarded in breach of contract cases." *U.S. for Use of Endicott Enterprises Inc. v. Star Brite Const. Co.*, 848 F. Supp. 1161, 1169 (D. Del. 1994). "When the contract does not specify an interest rate, 6 Del. Code § 2301(a) states that, 'the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due.'" *Id.* Here, Dr. Chappuis first breached the contract on March 28, 2009, when he sent confidential information to Bioaxxess investors. Ms. Sales and Ms. Dettwiler breached the contract on March 31, 2009, when Bioaxxess acquired a majority interest in Adipogen. On both dates, the Federal Reserve discount rate was 0.5%, thus the applicable Delaware pre-judgment interest rate is 5.5%.

"A party is entitled to postjudgment interest on any money judgment in a civil case recovered in a district court from the date of entry . . . at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price

61

for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." *Id.* at 1170. The Court finds that post-judgment interest is appropriate here, and orders it be paid at the aforementioned rate.

*Attorney's Fees*

In a letter subsequent to post-trial briefing, Plaintiff argued that it was entitled to attorney's fees as a result of an indemnification provision in the Stock Purchase Agreement. (D.I. 201 pp. 6-7, *see generally* PX5 at ¶¶ 7.1-7.7). Indemnification was not raised at trial. No testimony about attorney's fees was offered at trial. Thus, any claim based on the Stock Purchase Agreement for indemnification was not proven at trial.

# CONCLUSION

The Court finds in favor of Plaintiff as to Count I and for Defendants on all remaining Counts. The Court grants nominal damages in the amount of one dollar against each of Ms. Sales and Ms. Dettwiler, and ten dollars against Dr. Chappuis, in addition to pre- and post-judgment interest.

The Court will enter a separate final judgment.